CAMPBELL, COMMISSIONER OF AGRICULTURE
OF GEORGIA, ET AL. *v.* HUSSEY ET AL.

No. 42.  Argued November 14–15, 1961.—Decided December 18, 1961.

*G. Hughel Harrison,* Assistant Attorney General of
Georgia, and *Denmark Groover, Jr.* argued the cause for
appellants.   With them on the briefs were *Eugene Cook,*
Attorney General, *Gordon Knox, Frank S. Twitty* and
*Chris B. Conyers,* Deputy Assistant Attorneys General.

*Homer S. Durden, Jr.* argued the cause for appellees.
With him on the brief were *Darius N. Brown* and *William
J. Neville.*

*Sherman L. Cohn,* by special leave of the Court, argued the cause for the United States, as *amicus curiae,* urging affirmance. With him on the brief were *Solicitor General Cox, Assistant Attorney General Orrick* and *Alan S. Rosenthal.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit brought by owners and operators of tobacco warehouses in Georgia to enjoin officials of Georgia from enforcing certain provisions of the Georgia Tobacco Identification Act. Ga. Laws 1960, No. 557, p. 214. A three-judge court was convened, 28 U. S. C. §§ 2281, 2284, and it granted the relief. 189 F. Supp. 54. The case is here by direct appeal.[1] 28 U. S. C. § 1253.

The provisions of the Georgia Act that are challenged concern type 14 flue-cured leaf tobacco. It is defined in § 1 of the Act as "that flue-cured leaf tobacco grown in the traditional loose-leaf area which consists of the State[s] of Georgia, Florida, and Alabama." By § 13 (A) of the Act type 14 tobacco received in a warehouse for sale [2] shall be marked with a "white sheet ticket."

Sales at these warehouses are sales within the competence of Congress to regulate. As stated in *Mulford* v. *Smith,* 307 U. S. 38, 47: "In Georgia nearly one hundred per cent. of the tobacco so sold is purchased by extra-state purchasers. In markets where tobacco is sold to both

[1] Of the several infirmities which Georgia's law is alleged to have, only one was reached by the lower court, namely, the constitutionality of the law in light of the requirements of the Commerce Clause. The complaint also challenged the constitutionality of the law on the grounds that it violated both the Equal Protection and the Due Process Clauses of the Fourteenth Amendment. Plainly the case was one to be heard by a three-judge court. See *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73.

[2] The manner of sale is described in *Townsend* v. *Yeomans,* 301 U. S. 441, 445; *Currin* v. *Wallace,* 306 U. S. 1, 7–8; *American Tobacco Co.* v. *United States,* 328 U. S. 781, 800.

interstate and intrastate purchasers it is not known, when the grower places his tobacco on the warehouse floor for sale, whether it is destined for interstate or intrastate commerce. Regulation to be effective, must, and therefore may constitutionally, apply to all sales."

Congress in 1935 enacted the Tobacco Inspection Act, 49 Stat. 731, 7 U. S. C. § 511, and in its declaration of purpose, § 2, 7 U. S. C. § 511a, stated:

". . . the classification of tobacco according to type, grade, and other characteristics affects the prices received therefor by producers; without *uniform standards* of classification and inspection the evaluation of tobacco is susceptible to speculation, manipulation, and control, and unreasonable fluctuations in prices and quality determinations occur which are detrimental to producers and persons handling tobacco in commerce; such fluctuations constitute a burden upon commerce and make the use of *uniform standards* of classification and inspection imperative for the protection of producers and others engaged in commerce and the public interest therein." (Italics added.)

By § 511b the Secretary of Agriculture is authorized "to establish standards for tobacco by which its type, grade, size, condition, or other characteristics may be determined, which standards shall be *the official standards of the United States* . . . ." (Italics added.)

Detailed standards have been prescribed by the Secretary. As to the "type" of tobacco, the regulations state: ". . . Tobacco which has the same characteristics and corresponding qualities, colors, and lengths shall be treated as one type, *regardless of any factors of* historical or *geographical nature* which cannot be determined by an examination of the tobacco." 7 CFR, 1961 Cum. Supp., § 29.1096. (Italics added.)

Type 14 is defined as "That type of flue-cured tobacco commonly known as Southern Flue-cured or New Belt

of Georgia, Florida, and Alabama, produced *principally* in the southern section of Georgia and to some extent in Florida and Alabama." 7 CFR, 1961 Cum. Supp., § 29.1100. (Italics added.)

The regulations also provide that the classification of the tobacco by type be placed on a federal inspection certificate and announced at the time the lot is offered in the auction (7 CFR § 29.80, 7 CFR, 1961 Cum. Supp., § 29.1144)—an identification made by a blue ticket.

The question is whether the federal scheme of regulation has left room for Georgia to identify type 14 tobacco with a white tag when it is grown in Georgia, Florida, or Alabama.

It is earnestly argued that there is no conflict between Georgia's regulation and the federal law, as all that Georgia requires is that type 14 tobacco, grown in Georgia, be labeled as such. In that connection it is pointed out that type 14 tobacco as defined by the federal regulations includes tobacco "produced principally" in Georgia, Florida, and Alabama and that labeling it by its geographical origin merely supplements the federal regulation and does not conflict with it.

We do not have here the question whether Georgia's law conflicts with the federal law. Rather we have the question of pre-emption. Under the federal law there can be but one "official" standard—one that is "uniform" and that eliminates all confusion [3] by classifying tobacco

---

[3] The court below stated:

"The Georgia statute defines Type 14 tobacco on the basis of geographical origin and upon no other basis. If it is grown in Georgia, it would be Type 14 under the Georgia law and be given a white tag; while if it came from the other side of the Savannah River in South Carolina it would not be Type 14 and would be given a blue tag. . . .

"Both the purpose and effect of the Georgia enactment were to make a distinction at the markets, by the color tags, between tobacco grown in Georgia and that grown elsewhere. The effect was to create

not by geographical origin but by its characteristics. In other words, our view is that Congress, in legislating concerning the types of tobacco sold at auction, preempted the field and left no room for any supplementary state regulation concerning those same types. As we have seen, the Federal Tobacco Inspection Act in § 2, 7 U. S. C. § 511a, says that "uniform standards of classification and inspection" are "imperative for the protection of producers and others engaged in commerce and the public interest therein." The House Report No. 1102, 74th Cong., 1st Sess., reviewed at length the harm to growers that resulted from the absence of regulations governing the "grades" of tobacco sold on the auction market. "There are between 60 and 100 grades in a single type of tobacco, and it is not practical for a farmer to familiarize himself with the technical factors on which these grades are based . . . ." *Id.*, p. 2. The need for "a definite standard" of grading, *id.*, p. 2, or of "standard grades," *id.*, p. 4, was repeated over and again. The importance of a "standard grade" was emphasized in the debates on the floor of the House. Congressman Hancock stated that this legislation provided that tobacco on the auction market "would be inspected by competent judges of tobacco in Government employ and graded according to United States standards of quality . . . ." 79 Cong. Rec. 11870. Congressman Mitchell added that "Standard grades would serve as a guide to farmers in classifying their tobacco for market." *Id.*, 11878. The Senate Report No. 1211, 74th Cong., 1st Sess., based its approval of the bill on a report made by the Department of Agriculture. After stating that the purpose of the bill was to provide "uniform standards" for the protection of farmers, the report added: "The bill would authorize the Secretary of Agriculture to establish

---

a wide disparity of price between the two groups of tobacco, the Carolina growers receiving a much lower amount. This resulted in losses of business to the plaintiff warehousemen." 189 F. Supp. 54, 59.

standards for tobacco by which its type, grade, size, condition, or other characteristics may be determined, and the standards so established would be the official standards of the United States for such purpose." *Id.*, p. 1.

The Act, as we have seen, adopts that view by making the "type, grade, size, condition" given inspected tobacco "the official standards of the United States." § 3, 7 U. S. C. § 511b. The regulations are precise and unequivocal in saying what those "official standards" are. Among other things they say, as already noted, that tobacco "which has the same characteristics and corresponding qualities, colors, and lengths shall be treated as one type, regardless of any factors of historical or geographical nature which cannot be determined by an examination of the tobacco." 7 CFR, 1961 Cum. Supp., § 29.1096. Tobacco is includable in type 14, regardless of where it may have been grown, provided it meets the specifications of that type.

We have then a case where the federal law excludes local regulation, even though the latter does no more than supplement the former. Under the definition of types or grades of tobacco and the labeling which the Federal Government has adopted, complementary state regulation is as fatal as state regulations which conflict with the federal scheme. *Missouri Pacific R. Co.* v. *Porter,* 273 U. S. 341, 346; *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230; *Hood & Sons v. Du Mond,* 336 U. S. 525, 543.

*Affirmed.*

Mr. Justice Whittaker concurs in the result.

Dissenting opinion of Mr. Justice Black, joined by Mr. Justice Frankfurter and Mr. Justice Harlan, announced by Mr. Justice Frankfurter.

Acting under unchallenged authority granted him by the Federal Tobacco Inspection Act [1] to classify tobacco

---

[1] 49 Stat. 731, 7 U. S. C. §§ 511-511q.

into "types" and "grades" and to designate "auction markets" at convenient points in "type areas," the Secretary of Agriculture has established a comprehensive tobacco classification system made up of some 27 different types of tobacco—based upon chemical qualities resulting from the geographical factors of soil and climate [2]—which are in turn broken down into some 170 different grades— based upon such visual factors as group, quality and color.[3] The question in this case relates to one of those 27 types, Type 14 flue-cured tobacco, and has nothing whatever to do with the Secretary's grade classification regulations.

Type 14 flue-cured tobacco, as defined in the official Department of Agriculture regulation, is:

> "That type of flue-cured tobacco commonly known as Southern Flue-cured or New Belt of Georgia, Florida, and Alabama, produced principally in the southern section of Georgia and to some extent in Florida and Alabama." [4]

While § 8 of the Federal Act requires tobacco sold at designated auction markets to bear a tag showing the Department of Agriculture's official grade, it contains no such requirement for a tag showing its official type.[5]

---

[2] See 7 CFR, 1961 Cum. Supp., § 29.1096. Under the Department of Agriculture's classification system, "type" is a subdivision of "class," which is largely determined by the method used to cure the tobacco. See 7 CFR, 1961 Cum. Supp., § 29.1040.

[3] 7 CFR, 1961 Cum. Supp., § 29.1053.

[4] 7 CFR, 1961 Cum. Supp., § 29.1100.

[5] While the two Department of Agriculture regulations cited by the Court, 7 CFR § 29.80 and 7 CFR, 1961 Cum. Supp., § 29.1144, could arguably be interpreted to impose a federal requirement that type as well as grade be shown on each lot of tobacco sold, the record in this case plainly indicates that this is not the Department's interpretation of its own regulations. In the first place, every witness in this case who was called upon to describe the situation existing prior to 1960 stated unequivocally that the tobacco type did not appear on the

Because of this omission and the fact, established here by expert testimony, that during the last five years Type 14 "tobacco has had the reputation of being the best tobacco produced in the United States," growers and speculators from areas outside Georgia, Florida and Alabama have taken advantage of the general similarity in appearance of all types of flue-cured tobacco in order to sell their tobacco on Georgia markets as Type 14. Acting on complaints that this practice constituted a fraud upon Georgia tobacco growers as well as upon buyers coming into the State, the Georgia Legislature passed a law requiring that warehousemen within the State place a tag on all tobacco sold within the State showing whether it is Type 14 tobacco or not.[6] To accomplish this purpose the Georgia law established the following definition:

> "Type 14 flue-cured leaf tobacco as used herein shall mean that flue-cured leaf tobacco grown in the traditional loose-leaf area which consists of the State[s] of Georgia, Florida, and Alabama." [7]

Despite the variations in their wordings, it is obvious that there is no conflict between this Georgia law and the regulation of the Department of Agriculture and that the definitions of Type 14 tobacco in the Georgia law and the federal regulation mean precisely the same thing— namely, that tobacco grown in Georgia, Florida and Alabama, and that tobacco only, can be classified as Type 14. Whatever doubt might otherwise have existed on this score is completely dispelled by the record in this case. For the parties to this lawsuit, who have lived under and can be presumed to be familiar with the Department of

---

government label attached to the tobacco at the time of sale. And the Department's own official said that this was not presently required.

[6] The Georgia Tobacco Identification Act, Ga. Laws 1960, No. 557, p. 214.

[7] § 1.

Agriculture's regulation, themselves stipulated that the Federal Government had "designated as Type 14 tobacco only flue-cured tobacco grown in Georgia, Florida, and Alabama." Two responsible Department of Agriculture officials unequivocally supported the correctness of this stipulation—one testifying that Type 14 was a classification according to "geographical origin" and the other, the then Director of the Tobacco Division of the Commodity Stabilization Service,[8] testifying that only three things went in the Department's Type 14 definition, "geography, soil and climate." There was also in evidence the 1959 official map of the Department showing, as has every other Department map since passage of the Act,[9] that all Type 14 flue-cured tobacco is grown well within the borders of Georgia, Florida and Alabama and that the other "type areas" in which flue-cured tobacco is grown do not even approach the plainly defined limits of the Type 14 area.[10] That the Department of Agriculture did not regard the Georgia law attacked here as inconsistent with its regulations is further, and specifically, shown by the fact that after passage of the Georgia law, the Department itself issued a regulation, 6 CFR, 1961 Cum. Supp., § 464.1211 (b)—which the record shows was designed to protect Florida markets precisely as the Georgia law protects Georgia markets—approving the Georgia defi-

[8] The Commodity Stabilization Service and the Agricultural Marketing Service are the two branches of the Department of Agriculture most directly involved in the marketing of tobacco.

[9] In addition the definition of Type 14 is exactly the same now as it was under the first Tobacco Inspection Act Regulations. See § 29.156 (vv) of the Rules and Regulations of the Secretary of Agriculture, Aug. 7, 1936.

[10] It seems clear from this that the solicitude of the court below for Type 14 growers in South Carolina, as shown in note 3 of the Court's opinion, is entirely misplaced. The Department's official map, referred to above, shows plainly that all South Carolina flue-cured tobacco is Type 13.

nition by also requiring identifying colored tags for "all tobacco . . . offered for sale at auction which is determined to have been produced in Georgia, Florida, or Alabama." Thus it is clear beyond dispute, as the Department's map and regulation recognized, that neither the Georgia nor the Department definitions of Type 14 conflict with the requirement of Department regulation § 29.1096 that tobacco with the "same characteristics . . . shall be treated as one type, regardless of any factors of historical or geographical nature which cannot be determined by an examination," because there are geographical factors of soil and climate in Georgia, Alabama, and Florida resulting in distinct "characteristics" which are determinable by chemical examination.

The Court is therefore compelled to decide this case, as to me it apparently does, on the premise that the Georgia definition of Type 14 tobacco is not in conflict with, but rather is precisely the same as, the federal definition. Consequently, the Court must accept as an undoubted fact that the full effect of the Georgia law is simply to assure that bidders at Georgia auction markets located in the Type 14 area will be able to distinguish between officially classified Type 14 tobacco, grown only in Georgia, Florida and Alabama, and other types of tobacco grown in other States. Since the conceded basic purpose of the Federal Act itself was to assure that tobacco growers and buyers would have as much information as possible about the commercial qualities of tobacco sold on auction markets, the Court must also admit that this Georgia law is designed to and does help to effectuate the Federal Act and to secure all of the benefits of that Act's official tobacco type classifications. At least as early in the history of this country as 1619, when Virginia passed its first tobacco inspection act, the States have sought to protect honest sellers of tobacco from those who were

willing for a profit to damage the integrity of the product.[11] Yet the Court now holds that Congress, by passing the Federal Tobacco Inspection Act, intended to cover the entire field of tobacco regulation, even to the extent of compelling States to abandon historic laws that are not only completely in harmony with federal type classifications, but are actually necessary to give them full effect.

In so holding it seems to me that the Court departs drastically from its long-continued practice of not striking down state laws as unconstitutional except where such decisions are compelled by considerations which are manifest and clear after careful study and analysis of the issues involved. Here the Court's opinion presents not so much as one fact which indicates that Congress actually intended by the passage of the Federal Act to preclude the States from passing laws which require only that warehousemen place a label on each lot of tobacco offered for sale truthfully showing its official federal type. Indeed, the Court even cites two prior cases in which this Court, in dealing with this very same Federal Act, has explicitly recognized that there is no basis whatever in the Act's language, history or purpose to justify a finding of a congressional intent to pre-empt merely complementary state legislation. In *Townsend* v. *Yeomans*,[12] Mr. Chief Justice Hughes, after a full canvass of the language, history and purpose of the Federal Act and of tobacco inspection laws generally, rejected for the Court the contention that this Act precluded a Georgia law regulating the charges of warehousemen operating under the Act, pointing out that the federal law "had a limited objective," and going on to say:

> "Instead of frustrating the operation of such state laws, the provisions of the Act expressly afforded and

---

[11] Journal of the House of Burgesses (McIlwaine ed.), Laws, 1619, p. 11.

[12] 301 U. S. 441.

emphasized the opportunity for coöperation with the States in protecting the farmer's interests. In this view we find no ground for the contention that Congress has taken possession of the field of regulation to the exclusion of state laws which do not conflict with its own requirements." [13]

This statement was reiterated and buttressed when, two years later, the Court was called upon to pass on the constitutionality of the Tobacco Inspection Act in *Currin* v. *Wallace*.[14] Mr. Chief Justice Hughes, again speaking for the Court, expressly adhered to the view the Court had earlier taken of the Act:

"But [in *Townsend* v. *Yeomans*] we found nothing in the federal Act which undertook to regulate the charges of warehousemen and hence we concluded that Congress had restricted its requirements and left the State free to deal with the matters not covered by the federal legislation and not inconsistent therewith." [15]

I think it plain that the Court was entirely correct in the *Townsend* and *Currin* cases. There is not a word in the Tobacco Inspection Act nor anything that has been cited in its legislative history that indicates a clear and manifest purpose on the part of Congress to preclude the exercise by Georgia of the historic power of States to pass local legislation to protect the integrity of its tobacco on the market and to prevent the commission of fraud upon buyers who come to deal in tobacco within its borders. The purpose of the Federal Act, as plainly disclosed both in its language and legislative history, was to promote the dissemination of information on the tobacco market, not to restrict the availability of such

---

[13] *Id.*, at 454.
[14] 306 U. S. 1.
[15] *Id.*, at 13.

information.[16]   The failure of the Federal Act itself to
require the open disclosure of tobacco types as well
as tobacco grades cannot by any stretch of the imagi-
nation be taken as evidence of a congressional intent that
tobacco types should remain a secret on the market.   For
the Act itself plainly shows why that omission was made.
Congress knew that the various types of tobacco were
grown in geographically separate "type areas" and fur-
ther knew that under the marketing practices then being
used in the tobacco industry tobacco was marketed in the
"type area" in which it was grown.   Consequently, under
the conditions then generally prevailing, there was no
need to require the disclosure of tobacco types for the
simple reason that no two types of tobacco were sold on
the same market.[17]

----

[16] Section 9 of the Act, 7 U. S. C. § 511h, provides: "The Secretary
is authorized to collect, publish, and distribute, by telegraph, mail, or
otherwise without cost to the grower, timely information on the
market supply and demand, location, disposition, quality, condition,
and market prices for tobacco." That this section constituted an
important part of the Act is shown by the statement of its sponsor,
Representative Flannagan, in introducing his bill on the floor of the
House of Representatives: "Simply stated the bill has two objects:
First, the grading of the growers' tobacco before sale by a competent
grader in order to determine what grades the growers have to offer
for sale, and second, furnishing the growers with a daily marketing
news service so they will know what the different grades of tobacco
are bringing on the other tobacco markets and thus put them in posi-
tion to intelligently accept or reject a sale. Surely the growers are
entitled to know what they are offering for sale—the different grades
of tobacco they have to offer—and the prices that the different grades
are bringing from day to day upon the different tobacco markets.
Deny them these rights and you deny them the opportunity to make
a fair and honest sale." 79 Cong. Rec. 11802.

[17] Since the earliest days of the tobacco industry in this country,
the marketing of the product has been almost exclusively on a purely
local basis. See Wyckoff, Tobacco Regulation in Colonial Maryland,
p. 62. That situation persisted substantially at least up to the year
1950. See Department of Agriculture Marketing Research Report
No. 101, The Auction Marketing of Flue-cured Tobacco, p. 8.

The record in this case shows, however, that marketing practices in the tobacco industry have changed radically in recent years. An ever-increasing amount of tobacco is being taken from the type area in which it is grown into another type area for sale [18]—particularly into Georgia, where the higher prices which prevail on that market as a result of the commercially superior qualities of Type 14 tobacco constitute a powerful lure to growers and tobacco speculators who want to sell superficially similar tobacco of other types. This tremendous influx of unidentified commercially inferior tobacco threatens literally to destroy the Georgia market for Type 14 tobacco and rob the tobacco growers of that State of the value of their labor. By attempting to eliminate claimed unfairness and outright fraud in the sale of tobacco on the Georgia federal markets, the Georgia Act thus seeks to do no more than prevent a partial frustration through changing commercial practices of the very objective Congress itself sought to attain by the enactment of the Tobacco Inspection Act.

The whole structure of the Federal Act plainly shows, I think, that, far from precluding this sort of state cooperation in the effectuation of the federal purpose, Congress affirmatively intended and, as pointed out by Mr. Chief Justice Hughes in the *Townsend* and *Currin* cases, actually hoped for such cooperation. The Tobacco Inspection Act is not one that forces federal regulation on unwilling local communities. Before the Secretary of Agriculture can designate "auction markets" upon which

---

[18] The record shows that this practice, which seems to have begun around 1955, has been growing each year since. Thus, in 1959, more than 22,000,000 pounds of non-Type 14 tobacco, representing some 17% of all the tobacco sold in Georgia that year, was brought into the State for sale to buyers on the implicit assumption that it was Georgia tobacco.

compliance with the provisions of the Act is mandatory, § 5 of the Act requires that a referendum be conducted and the consent of two-thirds of the growers who used the market in the previous season be obtained. That section also expressly denies the Secretary power to "close any market" or "to prevent transactions in tobacco at markets not designated" by him, although it does give him power to provide, on a purely voluntary basis, federal inspection and grading to those growers selling on such markets who wish to avail themselves of those services. Section 6 of the Federal Act expressly recognizes the continued existence of state functions and powers by providing that the Secretary of Agriculture may make agreements with state agencies covering employment of the inspectors, samplers and weighers who perform the tasks of inspecting, grading and typing tobacco, thus making it plain that even as to these most central features of the Federal Act Congress intended no sweeping exclusion of the States.

Insofar as the Court even bothers here to take a fresh look at the specific language and legislative history of the Federal Act, it does so, not for the purpose of re-evaluating the correctness of the understanding of the Act set forth in the *Townsend* and *Currin* cases, but solely for the purpose of showing that the Federal Act was designed to set up "uniform standards of classification and inspection" for tobacco to be sold at federally designated warehouses—a fact which I certainly do not controvert and which, so far as I know, none of the parties to this lawsuit has controverted. The Court makes no attempt to relate this fact to the issue in this case and show just how this congressional purpose supports an inference that Congress intended to preclude the States from requiring that the "uniform standards of classification" so established and applied by official federal inspection be disclosed on each lot of tobacco sold. Instead, the Court

proceeds from the bare fact of congressional legislation to the conclusion of federal pre-emption by application of a mechanistic formula which operates independently of congressional intent. That formula, as stated by the Court, is that "complementary state regulation is as fatal as state regulations which conflict with the federal scheme." I know of no case in which this formula has previously been applied by this Court. Certainly, the three cases which it cites do not support its action here.

*Missouri Pacific R. Co.* v. *Porter,*[19] the first case cited by the Court, did make the statement that state laws "cannot be applied in coincidence with, as complementary to or as in opposition to, federal enactments which disclose the intention of Congress to enter a field of regulation that is within its jurisdiction." But this statement was made only after the Court had discussed the congressional act involved there in great detail and found Congress to have concluded that "no other regulation is necessary." [20] That the Court in *Missouri Pacific* did not intend to go outside of the facts there before it and lay down a rule of automatic pre-emption by "coincidence" is plainly shown by the authorities relied upon to support its passing reference. The first case cited, *Napier* v. *Atlantic Coast Line R. Co.,*[21] is typical. In *Napier,* Mr. Justice Brandeis, in his usual careful way, declared that in considering the question of pre-emption "The intention of Congress to exclude States from exerting their police power must be clearly manifested . . . ." [22] The *Missouri Pacific* case can therefore support pre-emption only upon the basis of congressional intent and does not lend the slightest support to the mechanistic pre-emption rule which the Court applies here.

---

[19] 273 U. S. 341.

[20] *Id.,* at 346.

[21] 272 U. S. 605.

[22] *Id.,* at 611.

The second case relied on by the Court for its mechanical formula is *Rice* v. *Santa Fe Elevator Corp.*[23] The *Santa Fe Elevator* case, however, does not support the Court's mechanical formula any more than the *Missouri Pacific* case. On the very page cited by the Court, it was said:

> "Congress legislated here in a field which the States have traditionally occupied. . . . So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

More importantly, the Court did not in *Santa Fe Elevator* treat the question of pre-emption as one which could be settled by application of the rigid formula used here to strike down this Georgia law. Quite the contrary, recognizing that pre-emption "is often a perplexing question" the Court analyzed the issue before it at great length and concluded that Congress intended to pre-empt the supplementary state regulation there involved only after demonstrating that the language of the Warehouse Act as amended, "the special and peculiar history" of the amendment to the Act, and the underlying purpose of the Act all manifested a clear congressional purpose to pre-empt all state action in the field. Far from supporting the mechanical formula used by the Court here to declare Georgia's law unconstitutional, *Santa Fe Elevator* stands as a clear refutation of that formula, and contains a very clear statement of the proper rule which before today has governed this Court's holdings on pre-emption—the rule that pre-emption of the historic police powers of the States can be found only where "that was the clear and manifest purpose of Congress."

---

[23] 331 U. S. 218, 230.

The final case relied upon by the Court is *Hood & Sons* v. *Du Mond*.[24] But this was not a pre-emption case at all. There, a majority of the Court decided that a New York law burdened commerce in violation of the Commerce Clause. The Court's opinion did make a casual reference to "decisions that coincidence is as fatal as conflict when Congress acts," but it relied in no way upon this statement for its holding and the only case cited to support that proposition was one in which the Court held a State pre-empted by a federal statute only after carefully showing that Congress had intended to preclude state legislation of the kind there involved.[25]

Just a few weeks after the decision in *Hood & Sons* v. *Du Mond,* however, this Court did, in *California* v. *Zook,*[26] specifically deal with the argument "that when Congress has made specified activity unlawful, 'coincidence is as ineffective as opposition,' and state laws 'aiding' enforcement are invalid." The Court there emphatically rejected the idea that identity of purpose between a federal and a state statute meant "the automatic invalidity of state measures." It treated coincidence as only one factor in the complicated pattern of facts relevant to the question of pre-emption, pointing out, in the words of Mr. Justice Holmes, that this is a question which "must be answered by a judgment upon the particular case." [27] A dissent in the *Zook* case, written by Mr. Justice Burton

[24] 336 U. S. 525, 543.

[25] *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767.

[26] 336 U. S. 725, 729.

[27] *Id.,* at 731. The quotation relied upon from Mr. Justice Holmes is from his opinion for the Court in *Pennsylvania R. Co.* v. *Public Service Comm'n,* 250 U. S. 566, 569. This statement by Mr. Justice Holmes is especially significant in view of the fact that the primary authority often relied upon for a mechanistic rule of pre-emption is an earlier statement of his in *Charleston & Western Carolina R. Co.* v. *Varnville Furniture Co.,* 237 U. S. 597, 604. There, after holding the state statute involved unconstitutional as a burden on interstate

and concurred in by Mr. Justice Douglas and Mr. Justice Jackson, took the position, apparently taken by the Court here, that, when Congress passes a law in the interstate commerce field and the State passes one consistent with it, "coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." [28]   That when Congress passes a law regulating interstate commerce, all state laws in any way touching on the subject are obliterated was nothing but a dissenting view before this case was decided today.

The correct test in determining whether a federal act results in pre-emption is that stated in *Rice* v. *Santa Fe Elevator,* which requires that "the historic police powers of the States . . . not . . . be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." [29]   Measured by that test, the Georgia law here cannot be invalidated.

---

commerce, he said: "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go."   In view of his later holding, it seems clear that the oft-repeated remark of Mr. Justice Holmes was intended to be nothing more than a judgment of the intent of Congress "upon the particular case."   See also *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767, 783 (separate opinion of Mr. Justice Frankfurter).

[28] 336 U. S., at 752.   See n. 27, *supra.*

[29] *Napier* v. *Atlantic Coast Line R. Co.,* 272 U. S. 605, 611; *Missouri Pacific R. Co.* v. *Porter,* 273 U. S. 341, 346; *Kelly* v. *Washington,* 302 U. S. 1; *California* v. *Zook,* 336 U. S. 725; *Huron Portland Cement Co.* v. *City of Detroit,* 362 U. S. 440, 442–443.   All these cases and many others that could be cited plainly show that this Court has consistently rejected the idea that every time Congress passes a law all state laws touching on the same subject are automatically destroyed. See also *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, and the concurring opinion of Mr. Justice Harlan, joined by Mr. Justice Clark, Mr. Justice Whittaker and Mr. Justice Stewart, and cases cited therein.

There can be no doubt that the power upon which this Georgia law was based is one of the powers historically exercised by the States. As pointed out before, the power to regulate tobacco in order to protect the integrity of the product was exercised by Virginia as early as 1619. Indeed, in the midst of a marketing crisis in 1666, Lord Baltimore proposed a law closely similar to the Georgia law here which would have required that all tobacco from his Colony be labeled "Maryland" in order to distinguish it from Virginia tobacco, the only other type of tobacco then being grown in the Colonies.[30] Even this Court, in times past, has recognized the historic powers of the States in this area. In *Turner* v. *Maryland*,[31] the Court rejected the contention that the States are barred by the Commerce Clause from requiring that tobacco grown within their borders be labeled to indicate its origin, saying:

> "The legislature of the State of Maryland, from the earliest history of the colony and since the formation of the State government, has made the inspection of tobacco raised in that State compulsory. That inspection has included many features, and has extended to the form, size, and weight of the packages containing tobacco, as well as to the quality of the article. Fixing the identity and weight of tobacco alleged to have been grown in the State, and thus preserving the reputation of the article in markets outside of the State, is a legitimate part of inspection laws, and the means prescribed therefor in the statutes in question naturally conduce to that end."

---

[30] Wyckoff, Tobacco Regulation in Colonial Maryland, p. 76. Contemporary Virginia legislation also sought to protect the reputation of Virginia tobacco in much the same manner. 2 Hening, Laws of Virginia, Act VIII, 1679; 3 Hening, Laws of Virginia, c. V, 1705; 4 Hening, Laws of Virginia, c. VI, 1726.

[31] 107 U. S. 38, 49.

I do not question the doctrine that a purpose of Congress to preclude all state legislation can be implied if the history, purpose, language, and comprehensiveness of an act makes such a congressional purpose clear and manifest. But I do not think that such a purpose can properly be found through use of so mechanically compelling a formula as the Court uses here—particularly when the result is to undercut a state policy of protecting tobacco growers and purchasers which has the experience in this country of almost three and a half centuries behind it.