ZEHMER, Judge.
The Department of Banking and Finance appeals the circuit court’s order denying the Department’s motion for a preliminary injunction to prohibit Standard Federal Savings & Loan Association and K-Mart Corporation from continuing their program of marketing Standard Federal money market accounts and certificates of deposit through K-Mart stores located in Ft. Laud-erdale, Orlando, and St. Petersburg. There are two primary issues on appeal:
1. Whether the circuit court erred in finding that “the federal government, by virtue of Title 12, U.S. Code, Section 1464, et seq., has preempted the regulation and supervision of federal savings and loan associations” to the extent that Standard Federal’s marketing program canrtot be controlled or regulated by state law?
2. Whether the circuit court erred in finding that, pursuant to Greater Miami Financial Corp. v. Dickinson, 214 So.2d 874 (Fla.1968), the activities of K-Mart and its subsidiary do not constitute “the business of soliciting or receiving funds for deposit,” in violation of Section 658.74, Florida Statutes (1983), which restricts such activities to state or national banks.
Both parties have represented that the operative facts are not in dispute. We adopt the statement of the facts set forth in the appealed order:
2. Defendant, Standard Federal Savings and Loan Association, hereafter referred to as ‘Standard Federal,’ is a federal savings and loan association chartered by the Federal Home Loan Bank Board (FHLBB) pursuant to the Home Owner’s Loan Act of 1933,12 U.S.C. 1464. It is a large mutual savings and loan association, located in Troy, Michigan. Defendant, K-Mart Corporation, hereafter referred to as “K-Mart,” is a large chain of retail stores operating in many parts of the country including Florida, and is chartered in Michigan. Its individual stores are in the category of large department stores engaged in the marketing of a vast variety of goods and services. K-Mart Insurance Services, Inc. (KMI), a wholly owned subsidiary of K-Mart, is a Texas corporation. Both K-Mart and its satellite subsidiary KMI are qualified to do business in Florida. Neither K-Mart nor KMI is registered as a broker/dealer under Florida or federal securities laws.
*299 3. A written agreement was entered into December 22, 1983 between Standard Federal and KMI whereby KMI agreed to introduce members of the public, who come on the premises of certain K-Mart stores, to Standard Federal’s “certificates” and money market deposit accounts, and to solicit their interest in opening such accounts with Standard Federal. For such accounts as are opened pursuant to KMI efforts, a “finders fee” would be paid by Standard Federal to KMI. In paragraph 10 of the agreement are certain representations of KMI with regard to its corporate authority and other capacity to perform the contract. The contract was executed by the chief officers of both Standard Federal and KMI. Also, K-Mart contracted to act as guarantor of all obligations and duties of KMI, ‘and hereby makes all of the representations and warranties set forth in paragraph 10 hereof with regard to its execution of this Guaranty.’
4. Pursuant to these agreements, Standard Federal seeks to market through KMI, operating in stores of K-Mart, including three of K-Mart’s Florida stores, three types of money accounts involving the placing with Standard Federal funds in exchange for certain certificates evidencing the terms of the account. One type is designated “K-Mart Certificate,” with a term of as short as 91 days or as long as 120 months, with a minimum balance of $1,000 for 12 months or less and a less amount for 13 to 120 months. It provides for interest at money-market rates and allows withdrawals, and has other features similar to accounts of this kind. There is also a “K-Mart Bonus Rate Certificate” which provides a higher interest rate for a limited initial period, and the third type is designated “K-Mart Fund,” with a minimum balance of $2,500 and maximum of $100,000 with certain bonus interest on minimum balances of $25,000 and $50,000. Deposits and withdrawals with certain check writing features are provided. In the cities in which the accounts were offered, there were advertisements in daily newspapers in large type proclaiming that at K-Mart there could be procured high yielding insured savings accounts and describing generally the certificates available. In both the newspaper ads and the brochures the K-Mart logo is used and emphasized. Standard Federal is identified, and also the fact of the accounts being insured by Federal Savings and Loan Insurance Corporation is given some publicity. However, the emphasis is on K-Mart and its location. Its motto “the place to save,” is given display. KMI is not mentioned in the literature or advertizements.
5.The mode of operation pursuant to the contract is fairly simple. Space is provided at a K-Mart store for an employee or employees of KMI to contact members of the public interested in the savings accounts offered. Such employees explain to the prospects the contracts available, answer any questions that are asked, and, if a customer is responsive, helps fill out an application for the account desired, accepts checks, money orders or other negotiable instruments payable to Standard Federal, and forwards them to Standard Federal in Michigan to be processed. The contract is complete upon acceptance by Standard Federal, but the account is back dated to the date the application is made at K-Mart. After forwarding the application and check to Standard Federal, there is no further participation of K-Mart, KMI or its employees in the account. Standard Federal communicates by mail or telephone with the customer and all further dealings of any kind are made directly between the customer and Standard Federal. There is no contract of any kind between the customer and K-Mart or KMI.-... The contract arises upon acceptance by Standard Federal and the relationship of creditor and debtor is thereby created between those parties.
Early in 1984, the Department filed a complaint for preliminary and permanent injunction against Standard Federal and K-Mart on the ground that their participation *300 in the program described above constitutes an unauthorized branch banking operation in Florida in violation of sections 658.74[1] and 665.1001(2),[2] Florida Statutes (1983). The Department contends that the sale of certificates of deposit and the receipt of funds for deposit into savings accounts at Standard Federal through the K-Mart stores in Florida constitutes branch banking because K-Mart and KMI are essentially operating as agents of Standard Federal. Since Standard Federal is doing business through agents in Florida, the Department reasons, it has established a physical presence in the state sufficient to constitute a branch office, in violation of the applicable Florida statutes. The trial court denied the preliminary injunction on the grounds that federal statutes and regulations have fully preempted the state’s regulation of the establishment, operation, and supervision of federal savings and loan associations in Florida, and ruled that the Department may not enforce Florida statutes regulating branch banking against Standard Federal in this state court action. The court also ruled that the activities of K-Mart and its subsidiary, KMI, do not constitute banking activities which they are prohibited from engaging in by section 658.74, Florida Statutes.
The Department appealed the nonfinal order denying the preliminary injunction pursuant to rule 9.130(a)(3)(B), Florida Rules of Appellate Procedure.
FEDERAL PREEMPTION
The doctrine of federal preemption is based on the federal supremacy clause, Article VI, of the United States Constitution. Pursuant to this clause, Congress may exercise its powers to occupy a legislative field and thereby preempt state laws. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Where Congress has chosen to occupy a field, the doctrine of preemption applies and federal law (not state law) controls. Campbell v. Hussey, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961). Whether Congress has chosen to occupy a field and thereby preempt state regulation is a matter of congressional intent, or regulatory intent in the case of regulations promulgated under authority derived from congressional legislation, whether expressed in an explicit or implicit fashion. Express intent to preempt usually appears in the language of the statute or regulation itself; implicit intent to preempt an area is derived from the existence of several factors:
The Congressional purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Or the Act of Congress *301 may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.... Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.
* * * * * *
Even if Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute. A conflict will be found ‘where compliance with both federal and state regulations is a physical impossibility’ ... or where the state ‘law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.’
Ray v. Atlantic Richfield Co., 435 U.S. 151, 157-58, 98 S.Ct. 988, 994-95, 55 L.Ed.2d 179 (1978), quoting in part from Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) [citations omitted]. State regulation is deemed preempted where its enforcement “frustrates the full effectiveness of federal law.” Perez v. Campbell, 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971).
Clearly, Congress has not sought to preempt all vestiges of state regulation over the establishment, operation, and supervision of banking institutions and savings and loan associations. The division between state and federal responsibility has generally fallen along the lines of state regulation of state-chartered banks and savings and loan associations, while federal regulation governs federally chartered banks and savings and loan associations. Considerable, and sometimes confusing, overlapping of regulatory jurisdiction occurs because certain state institutions are insured by federal insurance agencies, e.g., the Federal Deposit Insurance Corporation and the Federal Savings and Loan Insurance Corporation. Consequently, a statement that Congress has totally preempted the regulation of all operational activities by federal savings and loan associations is simply too broad.[3] The precise question presented in this case is whether the relevant circumstances show that Congress has implicitly preempted state regulation of interstate solicitation and receipt of deposits by federal savings and loan associations.
We recognize, as pointed out by the Department, that federal courts are reluctant to interfere with state court deliberations in an area of concurrent state and federal regulations, Federal Home Loan Bank Board v. Court of Common Pleas, 510 F.Supp. 40 (N.D.Ohio 1981), and that “the fact that federal statutes or regulations covering some aspects of a regulated area are, by necessity, complex and detailed, does not imply that Congress intended to occupy the entire field to the exclusion of state law.” Morse v. Mutual Federal Savings & Loan Assn, of Whitman, 536 F.Supp. 1271,1280 (Dist. of Mass.1982). We agree with the Department’s observation that a court “should exercise extreme caution before finding preemption based upon federal agency action even assuming the agency has the delegated power to take such action.” Bleecker Associates v. Astoria Federal Savings & Loan Assn., 544 F.Supp. 794, 798 (S.D.N.Y.1982).
On the other hand, where a state court enjoined a federal savings and loan association’s solicitation of deposits in a manner contrary to state law, such injunction was held invalid on the ground of federal preemption. People of State of California v. Coast Federal Savings & Loan Assn., 98 *302 F.Supp. 311 (S.D.Cal.1951). Ruling that the Federal Home Loan Bank Board (Board) had primary jurisdiction over solicitation and receipt of deposits by federal savings and loan associations, and that the state court lacked jurisdiction to enjoin such activity, the court in that case stated:
Congress expressly delegated the duty and authority to the Board to make policy, including the power to make rules and regulations for the organization, incorporation, examination, operation, supervision, and regulation of such associations which delegation of authority is constitutional.
* * * * * *
The Board has adopted comprehensive rules and regulations concerning the powers and operations of every Federal savings and loan association from its cradle to its corporate grave.... These rules and regulations have the force and effect of law, and are noticed judicially.
Id. at 316. See also, Conference of Federal Savings & Loan Associations v. Stein, 604 F.2d 1256 (9th Cir.1979), affd. 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980). This statement was quoted with approval by the United States Supreme Court in Fidelity Federal Savings & Loan Assn. v. de la Cuesta, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), holding that the Board’s regulations permitting the use of due-on-sale clauses preempted state law on the subject because the state law attempted to place greater restrictions on the practices of federal savings and loan associations than did the Board’s regulations and, thus, created an obstacle to the accomplishment and execution of the full purposes and objectives of the due-on-sale regulation.
In Washington Federal Savings & Loan Assn, of Miami Beach v. Balaban, 281 So.2d 15 (Fla.1973), the Florida Supreme Court addressed the question of federal preemption of the state’s efforts to regulate Washington Federal’s opening of a branch office in Florida in ostensible violation of Florida law. Holding that the state court could not enjoin Washington Federal's participation in a hearing before the Board in connection with its application for permission to open a branch office, the court stated:
By virtue of Title 12 U.S. Code, Section 1464 et seq., the Federal Government has pre-empted the regulation and supervision of federal savings and loan associations and the organization, incorporation, examination and operation of the same and location of offices and branch offices of federal savings and loan associations.
281 So.2d at 17. To a limited extent, therefore, the Florida Supreme Court has already addressed the preemption question before us, and its decision would appear to be controlling.
The Department contends, however, that since the decision in Washington Federal was handed down, Congress has amended the Home Owners Loan Act of 1933, 12 U.S.C.A., section 1464, and the Board has promulgated rules which reveal rather clearly that neither Congress nor the Board intends that federal law fully preempt regulation of the establishment, operation, and supervision of interstate branches by federal savings and loan associations because both the amended statute and the regulations defer to state law on this subject. It is true, as the Department argues, that Congress enacted the Garn-St. Germain Depository Institutions Act of 1982, Pub.L. 97-320, in 1982, amending section 1464 by adding subparagraph (r)(l), which limits the establishment or operation of “a branch outside the State in which the association has its home office” unless the association qualifies as a domestic building and loan association under section 7701(a)(19) of the Internal Revenue Code of 1954, or meets certain other specified asset requirements. New subparagraph (r)(2), however, provides that the limitations on branch operations contained in subparagraph (1) do not apply if one of four described conditions exists, including the condition described in subparagraph (2)(C) that “the law of the State in which the branch is or is to be located would permit establishment of the branch were the association an institution *303 of the savings and loan or savings bank type chartered by the State in which its home office is located.” This provision, the Department argues, clearly evidences congressional intent to defer to state law regarding the operation of interstate branches and, thus, not fully preempt state law and regulation on this subject.
Moreover, the Department points out, in 1981 the Board adopted a rule setting forth the policy that it would generally approve the establishment of a branch only in the state in which the home office is located and would approve acquisitions resulting in interstate branch operations only to “prevent the failure” of endangered federally insured institutions. 46 Fed.Reg. 19,221 (1981). The Department refers to the case of Independent Bankers Assn, of America v. Federal Home Loan Bank Board, 557 F.Supp. 23 (D.C.1982), wherein the Court rejected a challenge to the validity of the above statement of policy and observed:
The Board has not changed its policies to favor the widespread adoption of interstate branching by all federal S & Ls. Rather, the Board has indicated its willingness to consider interstate branching in those very limited cases where such action is necessary to prevent imminent failure while avoiding inordinate expense that would deplete government insurance funds.
Id. at 26-27. The Department also refers to the Board’s existing rule on interstate branching, 12 C.F.R. § 556.5(a), which states in part:
(2) As a general policy, the Board permits a Federal association to branch if state law or state practice, in absence of statutory prohibition, permits state financial depository institutions to branch or to conduct chain, group or affiliate operations.
Subparagraph (3) of that rule provides that “the Board generally will approve the establishment of a branch only in the state in which the home office is located” and thereafter lists certain exceptions to this general prohibition on interstate branching where the establishment of such out-of-state branch is caused by merger or acquisition of the assets of such institution “to prevent the failure of one of the institutions,” or to reduce the insurance liability or risk to the federal savings and loan insurance corporation as a result of maintaining the branch office. Finally, the Department refers us to the Board’s recently announced rule, 48 Fed.Reg. 20,930 (1983), implementing the provisions of the Garn-St. Germain Act, pointing out that the rule also defers to state law and would, for the first time, allow approval of interstate branches in a state the law of which authorizes the transaction by which the branch office is established. The Department argues that since this rule proposing expansion of branching authority fully defers to state law, that fact negates any blanket application of the preemption doctrine to foreclose the state’s regulation of any aspect of interstate branching by federal savings and loan associations. Consequently, the Department reasons, the decisions in Washington Federal, de la Cuesta, Coast Federal Savings & Loan Assn., and the other cases relied on by appellees all predate the Garn-St. Germain Act and were not decided in light of its provisions and, thus, are distinguishable and not controlling on this question.
We do not find the Department’s argument persuasive. Neither the amendments in Garn-St. Germain, 12 U.S.C. § 1464(r), nor the Board’s proposed rule implementing those amendments, 48 Fed. Reg. 20,930 (May 10, 1983), evidences any congressional intent to defer to state law for the regulation of interstate branch operations of federal associations. Section 1464(r)(2)(C) merely incorporates state law as the standard to be followed by the Board in approving the establishment of a branch office in a state other than that where the home office is located. The Board’s proposed rule at 48 Fed.Reg. 20,-930 operates in a similar fashion. Both the statutory amendments and the rule support the implication that Congress still intends to preempt state regulation of this matter. Both the statute and the rule make it clear that the Board will have exclusive jurisdic *304 tion to regulate interstate branching, whether such branches are established contrary to state law or in a manner consistent with state law. Both the statute and the rule establish the policy that it is preferable to avoid establishing interstate branches in violation of state law unless compelling circumstances, such as to save a financially failing institution, requires otherwise.
We think our conclusion is supported by the Board’s comments in support of its proposed rules to implement the Garn-St. Germain Act. 48 Fed.Reg. 20,930-32 (1983). The Board there recognizes that “although the HOLA did not specifically address the Board’s authority to permit branching until the passage of the Garn-St. Germain Depository Institutions Act of 1982,” nevertheless “the Board has always had the authority to regulate branching of federal associations on an intrastate and an interstate basis.” The commentary states that the Board has permitted branch operations since 1937 and has made a policy statement emphasizing its preference for intrastate operations, but also notes that “the policy statement made it clear, however, that the Board maintained its discretionary statutory authority to permit interstate branching.” The commentary observes that financial difficulties encountered by the savings and loan industry from the beginning of 1980 through March 1983 have required the Board to approve the merger of weakened institutions with stronger institutions; and since intrastate mergers could not accomplish that result in some instances, “the Board has amended its branching policy statement three times in the last two years to specifically authorize interstate operations by federally chartered institutions in supervisory cases.” The commentary then notes that the Garn-St. Germain Act “reinforced the Board’s existing plenary authority to approve branching by federally chartered institutions and expanded the authority of the Board to approve interstate activities resulting from transactions involving state-chartered insured institutions and savings and loan holding companies.” The commentary observes, however, that subpara-graph (r) of the amended section 1464 does limit the Board’s authority to permit branching to certain specified situations. The proposed rule then announces a new Board policy for interstate branching of federal associations, noting that some state-chartered institutions are permitted by state law to acquire out-of-state branches and “it appears that if federal thrifts are not permitted to branch to the same extent as their state-chartered competitors, they will operate at a competitive disadvantage with those state-chartered institutions.” For this reason, the Board proposes to permit the establishment of interstate branch offices, whether de novo, by merger, acquisition, or otherwise, on a nonsupervisory basis where state law authorizes the transaction. Thus, it seems rather clear from the proposed rule and its commentary that the Board is not deferring to state regulation of federal institutions regarding branch banking; rather, it is purporting to exercise its plenary authority under federal statutes to regulate interstate branch operations of federal associations on a basis that, while compatible with state law for the most part, permits federal institutions to adequately compete through interstate branches with state-chartered institutions.
Accordingly, we find no basis in the statutory amendments or the Board’s proposed rulé for holding the Washington Federal decision inapplicable to the question presented here. The trial court correctly ruled that the doctrine of federal preemption precluded the Department from enforcing state laws regulating branch banking against Standard Federal through an action in state court.
Appellees, Standard Federal and K-Mart, also contend the federal preemption doctrine should be further extended to prevent the Department from attempting to enjoin K-Mart or KMI from acting as a finder or broker of deposits for Standard Federal because the use of such finders by federal savings and loan associations is specifically authorized by federal law. Ap-pellees argue that the Department, by defining the activities of K-Mart as “engaging in the business of banking” and by *305 attempting to prohibit such activities through the enforcement of section 658.74, Florida Statutes, is seeking to eliminate the use of finders in Florida contrary to federal law. We refuse, however, to extend the doctrine of federal preemption to K-Mart and KMI. Although federal law does authorize Standard Federal’s use of finders in Florida, federal law does not purport to regulate such finders or brokers. Accordingly, K-Mart and KMI are fully subject to regulation by Florida laws regulating their activities as a finder or broker in Florida.
K-MART’S VIOLATION OF FLORIDA LAW
The Department contends that the activities of K-Mart violate section 658.74, Florida Statutes, which prohibits any person other than a state or national bank having its principal place of business in Florida from engaging in “the business of soliciting or receiving funds for deposit or of issuing certificates of deposit or of paying checks.” The trial court rejected this argument on the basis of the Florida Supreme Court’s decision in Greater Miami Financial Corp. v. Dickinson, 214 So.2d 874 (Fla.1968). In Greater Miami, the court reviewed a factual scenario involving the activities of a savings account broker in Florida who assisted his customers in relocating their money into out-of-state savings and loan associations at more favorable interest rates. As in the present case, the Florida comptroller sought to attack the arrangement on the ground that the actions of the broker constituted banking in violation of section 659.52(1), Florida Statutes (1959), the predecessor statute to section 658.74. Holding that the activities involved had “none of the characteristics of a savings and loan association,” the Supreme Court interpreted section 659.52(1) as “obviously designed to prevent non-banking institutions from exercising the powers or performing the functions of banks.” Id. at 877. The Court found the absence of a debtor/creditor relationship to be fatal to the comptroller’s claim that the brokering of savings accounts to out-of-state financial institutions constituted the business of banking, stating:
The appellant does not establish a debt- or/creditor relationship with its customers. Unlike a bank, it does not accept deposits for which it has any responsibility of redemption. It does not pay interest, issue or honor checks drawn upon it, issue savings account passbooks, lend money, charge interest, or issue monthly statements or any other evidence of indebtedness by or to its customers.
Id. at 876.
The function of K-Mart and KMI in the Standard Federal program is simply to acquaint potential depositors with the various accounts, to assist persons indicating an interest in opening such account to complete the necessary documents, and to accept, for forwarding to Standard Federal, an initial deposit in the form of a check or money order made payable only to Standard Federal. All further transactions and contacts with respect to the account are handled exclusively between the depositor and Standard Federal. Thus, as in the Greater Miami case, neither K-Mart nor KMI establishes a debtor/creditor relationship with its customers or engages in any other traditional banking functions. The trial court properly ruled, consistent with the Greater Miami decision, that the activities of K-Mart do not violate section 658.74 of the Florida banking laws.
The Department attempts to distinguish Greater Miami by pointing out that the language used in section 659.52(1), the statute construed in that case, stated that no person other than a bank shall “solicit or receive deposits,” while the present statute (section 658.74) states that no person other than a bank shall “engage in the business of soliciting or receiving funds for deposit.” The Department argues that the statutory language was changed to overcome the Greater Miami decision and recognize that entities which receive funds solely for deposit in other institutions are engaging in the business of banking in violation of section 658.74 just as much as those receiving direct deposits. We reject this interpretation of the change in statutory language. In the first place, the change in language occurred many years after the Greater Mi *306 ami decision, and this time lag belies any intention to overcome the Greater Miami decision. The Supreme Court's statement in Greater Miami that “this statute is obviously designed to prevent non-banking institutions from exercising the powers or performing the functions of banks” (Id. at 877), and the underlying rationale of the Greater Miami decision are equally applicable under the wording of both statutes. The actions of K-Mart and KMI do not amount to traditional banking functions within the scope of section 658.74, Florida Statutes, and are not subject to being enjoined as violating that section.
The Department did not allege a violation of state securities laws in its initial complaint against appellees, and that issue is not before us. We note, however, that both parties represented to this court at oral argument that the Department is in the process of amending its complaint to include such a claim. Our holding in this case does not reach, and is without prejudice to, the Department’s right to seek compliance by K-Mart and KMI with any applicable state securities laws or other state laws regulating brokers or finders of savings deposits that may be properly applicable to these parties.
SMITH and JOANOS, JJ„ concur.

. Section 658.74 provides in part:
(1)(a) No person other than a state bank or a national bank having its principal place of business in this state shall, in this state, engage in the business of soliciting or receiving funds for deposit or of issuing certificates of deposit or of paying checks; and no person shall establish or maintain a place of business in this state for any of the functions, transactions, or purposes mentioned in this subsection.
******
(2)(b) No bank, other than a state bank or a national bank having its principal place of business in this state, shall establish or maintain an office or place of business in this state for the purpose of engaging in the business of lending money or soliciting for such purpose.
******
(5) [NJothing in this code shall be construed to prohibit any advertisement or other activity in this state by any person if such prohibition would contravene any applicable federal law which preempts the law of this state, (emphasis added)

. Section 665.1001(2) provides:
No foreign association shall do any business of a savings association or savings bank within this state or maintain an office in this state for the purpose of doing'such business, including, but not limited to, the establishment of a branch office. The origination of real estate mortgages covering real property located in this state is considered doing business as a savings association unless the state of domicile of the principal business office of any such foreign association permits associations from this state to originate real estate mortgages covering real property located in such state.

. Justice O’Connor, concurring in Fidelity Federal Savings & Loan Assn. v. de la Cuesta, 458 U.S. 141 stated at pages 171-172, 102 S.Ct. 3014 stated at page 3032, 73 L.Ed.2d 664 (1982).
Although Congress delegated broad power to the [Federal Home Loan Bank] Board to ensure that federally chartered savings and loan institutions 'would remain financially sound’ ... it is clear that HOLA [Home Owner's Loan Act of 1933, as amended] does not permit the Board to pre-empt the application of all state and local laws to such institutions. Nothing ... in the Court’s opinion, should be read to the contrary. (Citations omitted)