William HUSSEY, Jr., Aulbert J. Brannen, Sr., Aulbert J. Brannen, Jr., Robert B. Brannen, George C. Sugg, Ed Wiggins, Guy Sutton, Sr., Mrs. L. B. Willoughby, Plaintiffs,

v.

Phil CAMPBELL, Commissioner of Agriculture of the State of Georgia, and Cecil Attaway, Defendants.

Civ. A. No. 326.

United States District Court
S. D. Georgia,
Swainsboro Division.

Nov. 9, 1960.

Homer S. Durden, Jr., and Darius N. Brown, Swainsboro, Ga. and Neville & Neville, Statesboro, Ga., for plaintiffs.

Eugene Cook, Atty. Gen., of Georgia and G. Hughel Harrison, Asst. Atty. Gen. of Georgia, for defendants.

Before JONES, Circuit Judge, and SCARLETT and SIMPSON, District Judges.

JONES, Circuit Judge.

The plaintiffs are owners or operators of tobacco auction warehouses in Swainsboro, Georgia, and in Statesboro, Georgia. They seek an injunction against the defendants, who are officials of the State of Georgia, to restrain the enforcement of certain of the provisions of an act for the regulation of the sale of flue-cured leaf tobacco passed by the General Assembly of Georgia, approved on March 7, 1960, and designated as Georgia Laws, 1960, pages 214 to 227, inclusive. The defendant, Phil Campbell, is the Commissioner of Agriculture of the State of Georgia, and by the statute he is given the duty of enforcing its provisions. It is alleged by the plaintiffs that the defendant, Cecil Attaway, is the official of the Georgia Department of Agriculture in charge of the enforcement of the statutory provisions under attack. A temporary restraining order was entered by the district judge, Frank M. Scarlett. This district court of three judges was constituted under 28 U.S.C.A. §§ 2281, 2284, for a determination of the cause. The defendants moved to dismiss the suit because of improper venue, but at the trial they filed a waiver of venue thus disposing of this issue. Freeman v. Bee Machinery Co., 319 U.S. 448, 63 S.Ct. 1146, 87 L.Ed. 1509, rehearing denied 320 U.S. 809, 64 S.Ct. 27, 88 L.Ed. 489. The defendants also filed a motion to vacate the temporary restraining order. The plaintiffs, by motion, sought to have the defendants' motion to vacate made more definite. The district judge, Frank M. Scarlett, reserved for the determination of the full court the questions presented by the motion to make more definite. The district judge declined to enter an order vacating the restraining order. The trial of the cause on final hearing made unnecessary any consideration of or ruling upon the motion to make more definite. The disposition made on final hearing has the effect of affirming the district judge in not vacating the temporary restraining order.

It is declared, in Section 1 of the Georgia statute, that

"It is the intent and purpose of this Act to enable producers to have

sufficient time to properly cure, prepare and have an adequate time to market their flue-cured tobacco in an orderly manner and to provide a means of identification of types of flue-cured leaf tobacco sold in this State to the end that all purchasers thereof may be assured of the positive identification of tobacco sold in this State. It is found by the General Assembly that it is essential that the provisions provided in this Act are necessary to the proper marketing and identification of flue-cured leaf tobacco. Type 14 flue-cured leaf tobacco as used herein shall mean that flue-cured leaf tobacco grown in the traditional loose-leaf area which consists of the State of Georgia, Florida, and Alabama."

The Act imposes upon the operators of tobacco auction warehouses, where flue-cured tobacco is sold, the duty of placing a white tag upon each sheet of type 14 tobacco, and a colored tag[1] upon each sheet of tobacco other than type 14, with the requirement that such tags shall remain on the tobacco where placed until after it is sold. Non-compliance with the tagging provisions of the statute by a warehouseman is made a felony punishable by imprisonment of one to five years, or a fine of not more than $5,000, or both. The statute recites that it is the intent and purpose of the tagging provisions "to provide a means to positively identify type 14 tobacco and to require that types other than type 14 be identified and marketed in such manner as to indicate the type to any person seeking to ascertain the type of tobacco offered for sale in this State." These are the provisions of the Georgia statute which the plaintiffs attack as contravening the Constitution of the United States and hence invalid.

In their complaint the plaintiffs charge that the statutory provisions mentioned, and the administration thereof consti-tuted an unlawful discrimination in making classification of tobacco based solely upon geographical origin by requiring a white tag to be placed on all Georgia grown flue-cured tobacco and a blue tag on all flue-cured tobacco grown elsewhere. It was asserted that at the Statesboro and Swainsboro markets a high percentage of the tobacco sold, prior to the statute, was grown in South Carolina or North Carolina. It was averred that, with the tobacco being tagged as the Georgia Act required, the buyers declined to purchase the blue-tagged tobacco from the Carolinas except at prices much less than was being paid for the white-tagged Georgia grown tobacco. A demoralization of the market resulted, as appears from the complaint, and the Carolina tobacco, in considerable quantity, was returned to the Carolinas and the Carolina growers, for the most part, kept their tobacco away from the sales warehouses of the plaintiffs and off the Georgia markets. It was stated that the enforcement of the Act had resulted in an unconstitutional impediment of the free flow of interstate commerce. The complaint recited that the tobacco brought to the warehouses for sale was inspected and graded prior to its sale by employees of the United States Department of Agriculture, acting under Federal law, who marked the grade of each pile of tobacco upon the identification tag of each pile of tobacco. Losses by the plaintiffs were claimed, and other claims were made of greater losses threatened, as a result of the enactment and enforcement of the challenged statutory provisions.

The defendants answered. By their answer they denied that interstate commerce is burdened by the operation of the Georgia Act, or that the Act bases the identification by type of tobacco solely on geographical origin. In their answer the defendants asserted that the enactment and enforcement of the Georgia Act were in the valid exercise of the

---

1. Designated as blue by the Commissioner of Agriculture.

police power of the state. The answer contained admissions of some facts pleaded by the plaintiffs and the denial of others. The material facts as admitted, stipulated or established by evidence will be hereinafter referred to in the course of this opinion.

A petition to intervene as a defendant was filed by Georgia Farm Bureau Federation, Inc., and intervention was allowed. In addition to joining with the defendants originally named in defending the Georgia Act against the attack made upon its validity, the intervenor has contended that the plaintiffs were without standing to raise the question of constitutionality.

At the beginning of the hearing the parties made the following stipulation:

"1. That Complainants have invested approximately $750,000.00 for the construction and equipping of their tobacco auction warehouses on Swainsboro and Statesboro, Georgia, markets.

"2. Said warehouses were built and equipped primarily as tobacco auction warehouses.

"3. Defendant is enforcing the Act of the State of Georgia complained of according to its terms.

"4. As an official standard of the United States the Federal Government has, under the Federal Tobacco Inspection Act, designated Types 11, 12, 13 and 14, known as flue-cured tobacco, and has designated as Type 14 tobacco only flue-cured tobacco grown in Georgia, Florida, and Alabama.

"5. Under the Federal Tobacco Inspection Act the Federal Government has also established an official standard of grades of tobacco, which are the official standard of grades of tobacco of the United States consisting of 168 different grades of flue-cured tobacco.

"6. The Secretary of Agriculture of the United States has, by proper Rules and Regulations, implemented the Federal Tobacco Inspection Act.

"7. For several years approximately 50 percent of the total tobacco sold on the Statesboro and Swainsboro, Georgia, Tobacco Markets was grown in North Carolina and South Carolina.

"8. The United States Secretary of Agriculture designates tobacco auction markets, and under applicable laws, rules and regulations sales are limited to 440 baskets per hour per set of buyers, five hours per day and five days per week. Under the foregoing Statesboro has a maximum authorized sale of 4400 baskets of tobacco per day and Swainsboro 2200.

"9. Complainants show that the 1960 tobacco selling season opened in Georgia on July 28th, 1960, and sales were held on that date and on the 29th of July following; that large quantities of tobacco from North Carolina, South Carolina and Georgia were exposed for sale on said days; that the tobacco from the several states mentioned were all graded immediately prior to sale in the manner aforesaid and that such grades were assigned by official graders of the United States Department of Agriculture. The result of the sales for the two days mentioned revealed a disparity in price, offered or received for the tobacco from the Carolinas, bearing the blue identification tag mentioned and that of Georgia tobacco bearing the white tag mentioned. The said disparity on the whole was as much as $18.00 per hundred pounds in favor of the Georgia tobacco bearing a white tag as required by the Act complained of."

It is perhaps appropriate to observe at this point that, while parties may stipulate as to facts and, under some circumstances, may waive the benefit of constitutional or statutory provi-

sions, they cannot by stipulation fix or change the law. The construction of the statutes or regulations presents questions of law, and the courts will look elsewhere than to stipulations of the parties for the answers to such questions. Crabb v. Commissioner of Internal Revenue, 5 Cir., 1941, 121 F.2d 1015. Thus we will look to the Federal statute and regulations for the Federal standards of typing tobacco rather than to paragraph 4 of the foregoing stipulation.

The Tobacco Inspection Act, 7 U.S.C.A. §§ 511–511q, was enacted in 1935. The purpose of the Act was thus stated:

"Transactions in tobacco involving the sale thereof at auction as commonly conducted at auction markets are affected with a public interest; such transactions are carried on by tobacco producers generally and by persons engaged in the business of buying and selling tobacco in commerce; the classification of tobacco according to type, grade, and other characteristics affects the prices received therefor by producers; without uniform standards of classification and inspection the evaluation of tobacco is susceptible to speculation, manipulation, and control, and unreasonable fluctuations in prices and quality determinations occur which are detrimental to producers and persons handling tobacco in commerce; such fluctuations constitute a burden upon commerce and make the use of uniform standards of classification and inspection imperative for the protection of producers and others engaged in commerce and the public interest therein." 7 U.S.C.A. § 511a.

To carry out the purpose of providing for uniform standards, the Act provided:

"The Secretary [of Agriculture] is authorized * * * to establish standards for tobacco by which its type, grade, size, condition, or other

characteristics may be determined, * * *." 7 U.S.C.A. § 511b.

Acting under this grant of authority, the Secretary of Agriculture promulgated regulations fixing standards for flue-cured tobacco. Divisions and sub-divisions of class, type and grade are set up. "Class" is defined as being "A major division of tobacco based on characteristics caused by varieties, soils, or climatic conditions, and the method of cultivation, harvesting, or curing." 7 C.F.R. § 29.1040. The regulations define "Type" as:

"A division of a class of tobacco having certain common characteristics and closely related grades. Tobacco which has the same characteristics and corresponding qualities, colors, and lengths shall be treated as one type, regardless of any factors of historical or geographical nature which cannot be determined by an examination of the tobacco." 7 C.F.R. § 29.1096.

"Grade" is defined as "A subdivision of a type according to group and quality, and according to color when it is of sufficient importance to be treated as a separate factor." 7 C.F.R. § 29.1053. Another regulation provides that "Each grade shall be treated as a subdivision of a particular type and when the grade is stated in an inspection certificate the type shall also be stated." 7 C.F.R. § 29.1144.

The regulations define four types of flue-cured tobacco. Of these, we shall have occasion to refer to the following:

Type 12. "That type of flue-cured tobacco commonly known as Eastern Flue-cured, New Belt of North Carolina Flue-cured, or Eastern Carolina Flue-cured, produced principally in the coastal plains section of North Carolina, north of the South River." 7 C.F.R. § 29.1098.

Type 13. "That type of flue-cured tobacco commonly known as South-

eastern Flue-cured, South Carolina Flue-cured, or New Belt of South Carolina, produced principally in the coastal plains section of South Carolina and the southeastern counties of North Carolina, south of the South River." 7 C.F.R. § 29.1099.

Type 14. "That type of flue-cured tobacco commonly known as Southern Flue-cured or New Belt of Georgia, Florida, and Alabama, produced principally in the southern section of Georgia and to some extent in Florida and Alabama." 7 C. F.R. § 29.1100.

■ The tobacco sold at the warehouses of the plaintiffs was nearly all purchased for shipment in interstate commerce. Hence the operation of the warehouses and the auctions held at them were in interstate commerce and subject to the provisions of the Tobacco Inspection Act. Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Townsend v. Yeomans, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210.

The Georgia statute defines Type 14 tobacco on the basis of geographical origin and upon no other basis. If it is grown in Georgia, it would be Type 14 under the Georgia law and be given a white tag; while if it came from the other side of the Savannah River in South Carolina it would not be Type 14 and would be given a blue tag. This is the meaning of the statute and it was so construed and applied in practice. It is our considered conclusion that the Federal regulation does not classify flue-cured tobacco on the basis of geographical origin and this conclusion is reached notwithstanding an apparent contrary view recited in the stipulation. The regulations classify tobacco as to types by referring to the designations by which the several types are "commonly known" and by the areas in which each of the commonly known types are "produced principally." Thus, as the regulations require, tobaccos which have the same characteristics and corresponding

qualities, colors and lengths are to be treated as one type even though grown on different sides of a boundary between two states. The testimony of the defendants establishes that, in fact, tobaccos having the same characteristics and corresponding qualities, colors and lengths may be grown on both sides of the boundary line between Georgia and South Carolina.

■ Both the purpose and effect of the Georgia enactment were to make a distinction at the markets, by the color tags, between tobacco grown in Georgia and that grown elsewhere. The effect was to create a wide disparity of price between the two groups of tobacco, the Carolina growers receiving a much lower amount. This resulted in losses of business to the plaintiff warehousemen. The Georgia statute imposes upon the producers of tobacco in other states who bring their products into that state for sale onerous burdens which it does not impose upon Georgia growers. This is a discrimination in favor of the citizens of Georgia against the citizens of other states. It is a discrimination against goods in commerce grown outside of Georgia in favor of like commodities produced in that state. These discriminations result in an injury not only to the non-resident tobacco producers but to those engaged in the operation of the markets. The Federal Constitution forbids such discrimination as an unlawful interference with interstate commerce. Shafer v. Farmers Grain Co., 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909; 11 Am.Jur. 96, Commerce § 108. See Best & Co. v. Maxwell, 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275; Brimmer v. Rebman, 138 U.S. 78, 11 S.Ct. 213, 34 L.Ed. 862. The prohibition "continues until the commodity has ceased to be the subject of discriminating legislation by reason of its foreign character." Welton v. State of Missouri, 1 Otto (275, 91 U.S.) 275, 23 L.Ed. 347. Whether the discrimination is also a violation of the equal protection clause of the Constitution, U.S. Const. Amend. 14, is a question which

we need not decide. Cf. Hartford Steam Boiler Inspection & Insurance Co. v. Harrison, 301 U.S. 459, 57 S.Ct. 838, 81 L.Ed. 1223.

■ There is another reason which, we decide, requires that the typing provision of the Georgia statute be held invalid as being repugnant to the Federal Constitution. It is our view that the Congress, by the Tobacco Inspection Act, has so occupied or preempted the field covered by the challenged portion of the Georgia statute that the latter cannot stand. The Federal Act recites that "without uniform standards of classification and inspection * * * unreasonable fluctuations in prices and quality determinations occur * * *. Such fluctuations constitute a burden upon commerce and make the use of uniform standards of classification and inspection imperative * * *." 7 U.S.C.A. § 511a. The Secretary of Agriculture, upon investigation, is authorized "to establish standards for tobacco by which its type, grades, size, condition, or other characteristics may be determined, which standards shall be the official standards of the United States * * *." 7 U.S.C.A. § 511b. This language shows the intent of Congress that there shall be a scheme of Federal regulation for the classification, grading and typing of tobacco so pervasive as to require the inference that, within this field, no room would be left for state action. Rice v. Santa Fe Elevator Corporation, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447; Missouri Pacific Railroad Co. v. Porter, 273 U.S. 341, 47 S.Ct. 383, 71 L.Ed. 672; Napier v. Atlantic Coast Line Railroad Co., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432; Oregon-Washington Railroad & Navigation Co. v. State of Washington, 270 U.S. 87, 46 S.Ct. 279, 70 L.Ed. 482; Southern Railway Company v. Railroad Commission of Indiana, 236 U.S. 439, 35 S.Ct. 304, 59 L.Ed. 661; Note, 42 Va.L. Rev. 43. The Regulations of the Secretary of Agriculture carry out the statutory plan set forth by Congress.

We are unable to sustain the contention of the defendants that the questioned sections of the Georgia statute merely implement the Federal Act and regulations and are a valid exercise of the police power of the State. The Supreme Court has upheld the validity of a Georgia statute fixing maximum charges for handling and selling tobacco at auction warehouses, and rejected the contention that the state law was invalid because of occupation of the field by the United States in the enactment of the Tobacco Inspection Act. In so holding the Court stated the principle that furnishes us a guide to our decision. It was said:

"We are thus brought to the final contention of appellants that the state law, although not in conflict with any exertion of federal authority, must fall as being repugnant to the existence of an exclusive federal power although unexercised. The contention ignores the principle that this ground of invalidity is to be found only with respect to such matters as demand a general system or uniformity of regulation; that in other matters, admitting of diversity of treatment according to the special requirements of local conditions, the States may act within their respective jurisdictions until Congress sees fit to act." Townsend v. Yeomans, supra [301 U.S. 441, 57 S.Ct. 849].

In the case before us the Congress has found that uniformity of regulation as to classification was necessary, and the Congress has seen fit to act. This being so there can be no justification for the typing and tagging provisions of the Georgia statute under the police power. 11 Am.Jur. 86, Commerce § 94.

■ As has been shown, the typing classification as set up in the Georgia Act is purely geographical. Such a classification is in conflict with that of the United States. It has long been the rule that where state legislation conflicts with valid Federal regulation the

former must fall. Gibbons v. Ogden, 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23, Kelly v. State of Washington, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3. The provisions of the Georgia Act under scrutiny are not mere implementations of the Federal statute and regulations. They are in direct conflict with them.

■■ As has been noted, the intervenor questions the right of the warehousemen to question the constitutionality of the Georgia statutory provision. We shall assume that the objection of the intervenor may properly be made. The Federal courts have ever been reluctant to pass upon the validity of state statutes when attacked as violative of rights guaranteed by the United States Constitution. Only those who have been injured as the result of a denial of those rights can invoke Federal jurisdiction on constitutional questions. Voeller v. Neilston Co., 311 U.S. 531, 61 S.Ct. 376, 85 L.Ed. 322. The provisions which the plaintiffs assail directly bear upon them in the operation of their businesses. It is upon them that the act imposes the duty of placing the tags, white or colored, upon the tobacco. It is clearly established that compliance with these provisions has resulted in financial losses to the plaintiffs as well as to the growers from other states who desired to market their tobacco at the plaintiffs' warehouses. This being so, the plaintiffs may bring and maintain the action. 11 Am. Jur. 748, et seq., Constitutional Law § 111.

We are told that the Georgia statutory provisions are necessary, and serve a beneficent purpose. With respect to a like contention the Supreme Court has said:

"The answer is that there can be no justification for the exercise of a power that is not possessed. If the evils suggested are real, the power of correction * * * [rests] with Congress where the Constitution intends it shall be exercised with impartial regard for the interests of the people of all the states that are affected." Shafer v. Farmers Grain Co., 268 U.S. 189, 45 S.Ct. 481, 486, 69 L.Ed. 909.

Having determined that the provisions of the Georgia statute under discussion cannot withstand the assault made upon them, judgment will be entered determining that such provisions are in conflict with the United States Constitution and enjoining the defendants from their enforcement. Other provisions of the Georgia statute are not before us and are not considered by us. This opinion will serve as findings of fact and conclusions of law. Judgment will be entered in accordance with the conclusions here reached.