**Tom LEWIS, Complainant,**

**v.**

**Phil CAMPBELL, Commissioner of Agriculture of the State of Georgia, and Georgia Agricultural Commodity Commission for Tobacco, comprised of Herman C. Odom, as Chairman, and Willie McKinnon, C. C. Ramsey, T. W. Booth and Britt Dorsey, as Members, and Phil Campbell, Commissioner of Agriculture, Ernest B. Davis, as State Auditor of Georgia; Arthur K. Bolton, as Attorney General of Georgia, and William L. Lanier, as President of Georgia Farm Bureau Federation, as Ex Officio Members, Defendants.**

**Civ. A. No. 697.**

United States District Court
M. D. Georgia,
Athens Division.

Nov. 5, 1968.

William J. Neville, Statesboro, Ga., for plaintiff.

Homer S. Durden, Jr., Swainsboro, Ga., A. Joseph Nardone, Jr., Asst. Atty. Gen., Atlanta, Ga. and Denmark Groover, Jr., Macon, Ga., for defendants.

ELLIOTT, District Judge:

By this action the Complainant sought a temporary restraining order and a permanent injunction. The judge with whom the complaint was filed declined to grant the temporary restraining order and, pursuant to Complainant's request, a three-judge District Court was constituted under 28 U.S.C. § 2281, which provides for such a tribunal whenever the enforcement of a state statute is sought to be enjoined "upon the ground of the unconstitutionality of such statute". Together with other defensive pleadings, the Defendants filed a motion to dismiss the complaint upon the ground that it failed to state a claim appropriate for consideration by a three-judge District Court. The case came on to be heard before the three-judge tribunal on August 16, 1968 and the full court took the motion to dismiss under advisement and considered this contention of the Defendants along with other grounds of defense as the hearing progressed, reserving its ruling until conclusion of the presentation of evidence and argument. On August 27, 1968 the three-judge court entered an order concluding that the cause was not one appropriate for consideration by a three-judge court. The Court dissolved itself as a three-judge court and remitted the case to the single judge to whom the application was made for his disposition. The basis for this conclusion is set out in the language of the order entered by the three judges, a portion of which is as follows:

"The threshold question before us is whether this three-judge Court has jurisdiction to determine the merits of this action. We conclude that this three-judge Court does not have jurisdiction.

"The main thrust of Count Two is based almost exclusively on the ground of the unconstitutionality of the Georgia Agricultural Commodities Sales Promotion Act of 1968, relative to the identification of tobacco being in conflict with a federal statute regulating typing of tobacco. The sole gravamen of the complaint is that the State of Georgia has illegally entered a pre-empted field, and claims that the Commerce Clause of the Federal Constitution and the due process clause of the Fourteenth Amendment are violated are not sufficiently substantial to require the convening under 28 U.S.C. § 2281, of a three-judge court in a suit to enjoin the enforcement of the statute on the ground of its unconstitutionality. See Swift & Company v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194.

"It appearing to this district Court as thus constituted that the cause under consideration is not one cognizable by a three-judge Court, this Court hereby dissolves itself as a three-judge district Court and remits the case to the single judge to whom the application was made for his disposition."

After consideration, this opinion is now filed by the single judge in compliance with the requirements of Rule 52 of the Federal Rules of Civil Procedure.

The complainant is the owner or operator of a tobacco auction warehouse located in Swainsboro, Georgia. His complaint is set out in two counts. In Count I he alleges that the Defendants are in contempt by identifying the geographic origin of flue-cured loose-leaf tobacco on Georgia auction markets contrary to the prohibition of a perpetual injunction entered by a three-judge tribunal in the case of Hussey et al. v. Campbell et al., 189 F.Supp. 54 (1960), aff'd Campbell et al. v. Hussey et al., 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961). This contention is based on the proposition that the Defendants, by the compulsory attachment of Georgia labels on Georgia-grown tobacco which show the geographic origin of such tobacco, have violated the injunction referred to by enforcement of a Georgia statute known as the "Georgia Agricultural Commodities Sales Promotion Act" set out in Georgia Laws 1968, Volume I, pp. 1118–1125, and specifically §§ 12, 13, 14

and 15 of said Act, which relate to tobacco.[1] This count seeks an adjudication that the Defendants are in contempt and also seeks a permanent injunction against the Defendants and their successors in office enjoining enforcement of the labelling provisions of the section referred to as related to tobacco.

Count II of the complaint alleges that the Georgia statute above referred to and the compulsory labelling of Georgia-grown tobacco is unconstitutional on the ground that such state action of labelling to show geographic origin has intruded into a field of "typing" which has been pre-empted by Congress, it being therefore violative of Article I, Section 8, Paragraph 3 of the Constitution of the United States. This count also alleges that the State of Georgia has denied Complainant equal protection of the law in violation of the Fourteenth Amendment to the Constitution. However, a review of the pleadings and the evidence presented in this case clearly indicates that the question of equal protection is secondary to the main attack which is based upon the Supremacy Clause of the Constitution.

The Defendant, Phil Campbell, is the Commissioner of Agriculture of the State of Georgia, and the remaining Defendants are members of the Georgia Agricultural Commodity Commission for tobacco.

In their defensive pleadings the Defendants have contended that their actions have not violated the injunction issued by the Court in the *Hussey* case, supra, and they deny that the 1968 Georgia statute above referred to is in contravention of the Constitution of the United States for any of the reasons assigned. As heretofore noted, the Defendants also contended that this was not a proper matter for consideration by a three-judge court.

## COUNT I—THE CONTEMPT COUNT

■ In his initial presentation of the complaint to the single judge and in his opening statement to the three-judge Court counsel for Complainant did not insist on and apparently abandoned this count (R. pp. 14 and 117). However, even if this count is not to be considered abandoned I would hold that the relief therein sought could not be granted. The order referred to was entered by a Court other than this Court and this proceeding is not a part of that case.

1. These Sections of the Georgia statute are as follows:

"Section 12. When and if such labeling has been approved in the referendum such commodity commission shall adopt and cause labels to be printed which clearly show the product offered for sale was produced by a contributing member of such commodity commission. Such label shall in no way reflect grade, classification or other matter regulated or governed by any other agency of the State or Federal government. These labels for the tagging of the particular commodity are to be furnished to all handlers, warehousemen and/or distributors of the commodity or such others as the commodity commission shall require to affix the same. The cost for the preparation and distribution of said labels shall be paid for by the commodity commission from its funds.

"Section 13. When and if such labeling has been approved in the referendum, the handlers, warehousemen and/or distributors handling such commodity or such other persons as the commodity commission shall determine to be feasible shall be required to affix the label to the commodity prior to the producers sale of said commodity and said label shall remain affixed to said commodity until after the completion of the producers sale of the commodity. At all times said commodity is held for producers sale the label shall be clearly visible to the purchaser of that commodity.

"Section 14. Any mislabeling, false labeling or failure to label as required, of any such commodity shall constitute a violation of this Act and be punishable as for a misdemeanor.

"Section 15. In addition to other remedies, the Commissioner or the commodity commission for such commodity shall be authorized to enjoin the violation of any provision of this Act and the mislabeling or false labeling or failure to label of any commodity and the wrongful use of any label furnished by the commodity commission, even though such act also constitutes a misdemeanor."

Indeed, an entire new statute of the State of Georgia enacted since the order referred to is the subject matter of this proceeding. In this connection see Myers et al v. United States, 264 U.S. 95, 44 S.Ct. 272, 68 L.Ed. 577 (1924); In re Debs et al., 158 U.S. 564 at 595, 15 S.Ct. 900, 39 L.Ed. 1092 (1895). Furthermore, no evidence was presented which in my opinion would justify an adjudication of contempt against the Defendants or any of them.

## COUNT II—THE CONSTITUTIONALITY QUESTION

This count presents the question which is controlling—whether the Georgia Agricultural Commodities Sales Promotion Act of 1968 is unconstitutional for any of the reasons urged.

One of the Complainant's contentions is that the Act is unconstitutional because it violates the Commerce Clause of the Constitution and the due process clause of the Fourteenth Amendment thereto. The three-judge Court decided that these claims were not sufficiently substantial to require the convening of a three-judge Court and this would seem to dispose of these contentions. If that action by the three-judge Court did not dispose of these claims I now hold that the evidence does not show any violation of the constitutional provisions and I so conclude for these reasons: (1) tobacco may move freely between the states without any impediment from the statute under attack; (2) no substantial evidence is shown of any financial burden affecting commerce which accrues as a result of the application of the statute, the overwhelming weight of the evidence showing that there is no such burden; (3) all persons within the same class are treated in precisely the same manner.

We are left then with the question whether the Congress has so pre-empted the field as to preclude the enactment and enforcement of the statute under attack. The main thrust of Complainant's argument is on this ground.

A description of the manner and method of tobacco marketing and a review of the history of federal activity in this field and of previous litigation relative thereto is helpful in a consideration of this question.

After flue-cured tobacco is produced and prepared for market the producer takes his tobacco to a warehouse of his choice to be sold at auction. When the tobacco arrives at the warehouse it is weighed on scales provided by the warehouseman and then a warehouse ticket is placed on the pile and the tobacco is placed on the warehouse floor in rows adjacent to other piles of tobacco. After the tobacco is placed on the floor a U. S. Government Grader places a "grade" on each pile of tobacco.[2] On sale days an auction is conducted over each pile of tobacco and when the auction is completed the name of the buyer and the price of the pile is noted on the warehouse ticket. At this point the producer can either (a) accept the bid price, (b) place it in the Tobacco Stabilization Corporation (Government Loan), or (c) "no sale" it. The legal principle enunciated in the *Hussey* case was that the Congress of the United States had pre-empted the field as to "type" classification of tobacco and that under the Supremacy Clause of the Constitution a 1960 Georgia statute[3] attempting to set up a different "type" classification for flue-cured tobacco was unconstitutional.

A review of federal action in this field shows that in November, 1929, the United States Department of Agriculture, Bureau of Agricultural Economics, issued Service and Regulatory Announcement Number 118 wherein tobacco was classified by "type" as follows:

"Type—A subdivision of a class of leaf tobacco, having certain common

---

2. While the United States Government provides both "type" and "grade", as a practical matter "type" is normally determined as far as the ticket is concerned by the place of sale, i. e., tobacco sold in Georgia bears the "type 14" classification.

3. Georgia Laws 1960, p. 218, et seq.

characteristics which permit of it being divided into a number of related grades. Any tobacco that has the same characteristics and corresponding qualities, colors, and lengths, shall be treated as one type, regardless of any factors of historical or geographical nature which cannot be determined by an examination of the tobacco."

In this same regulation, flue-cured tobacco was broken down into Types 11, 12, 13, and 14.

Subsequently Congress passed the Tobacco Inspection Act approved August 23, 1935, 49 Stat. 731, 7 U.S.C.A. § 511 et seq., establishing the "official standards" for the classification of tobacco and authorizing the Secretary of Agriculture to adopt standards for tobacco by which its type, grade, size, condition, and other characteristics may be determined and making these standards the "official standards" of the United States. Under the authority of this law, the Secretary of Agriculture has made definitions as to standards for the various types of flue-cured tobacco as well as grades, and by properly issued federal regulations he has implemented the Tobacco Inspection Act and established the official standards of the United States insofar as they pertain to flue-cured tobacco.

Again Congress, under the Agriculture Adjustment Act of 1938, approved February 16, 1938, 52 Stat. 31, 7 U.S.C.A. § 1281, has by law made the official standards promulgated by the Secretary of Agriculture through regulations the official standards by statute and by statute adopted the types specified and classified in Service and Regulatory Announcement Number 118 of the Bureau of Agriculture Economics of the Department of Agriculture (7 U.S.C.A. § 1301(15)).

The official standards relative to tobacco as promulgated by the Secretary of Agriculture pursuant to the above quoted Congressional authority were the same when the 1968 Georgia statute (here under attack) was enacted as they were when the 1960 Georgia statute (the statute involved in *Hussey*), was enacted.

The essence of Complainant's argument is that the 1968 statute and the 1960 statute are in fact identical in purpose and operation, and that since the 1960 statute fell the 1968 statute cannot stand.

I do not find this contention to be sustained. As has been noted, under the federal regulations "type" is defined as follows:

"A subdivision of a class of leaf tobacco, having certain common characteristics which permit of its being divided into a number of related grades. Any tobacco that has the same characteristics and corresponding qualities, colors, and lengths, shall be treated as one type, regardless of any factors of historical or geographical nature which cannot be determined by an examination of the tobacco."

Under those same regulations "Type 14" is defined as follows:

"That type of flue-cured tobacco commonly known as Southern flue-cured, Southern bright, Southern District bright, New Belt of Georgia and Florida, Florida bright, Alabama bright, or Georgia flue-cured; and produced principally in the southern districts of Georgia and to some extent in Florida, Alabama and Mississippi."

In the Georgia Act of 1960 (involved in the *Hussey* case) the State of Georgia undertook to define "Type 14" as follows:

"Type 14 flue-cured leaf tobacco as used herein shall mean that flue-cured leaf tobacco grown in the traditional loose-leaf area which consists of the states of Georgia, Florida and Alabama." (Georgia Laws 1960, pp. 214, 215, § 1.)

A reading of those two definitions demonstrates that the fault in the 1960 Georgia Act was that it undertook to define "type" based in part, if not wholly, upon geographic origin rather

than upon the common characteristics as specified in the federal regulations and statutes. Under that Georgia law tobacco could be Type 14 under federal regulations and classifications and not Type 14 under Georgia law. On the other hand, the 1968 Georgia statute here under attack in no way undertakes to "type" or otherwise classify tobacco in any respect. It simply provides for a label of identification of the producer of that tobacco for the avowed purpose of promoting the sale of that tobacco and the labelling requirement goes into effect only after two-thirds of the affected producers indicate their approval of such action by referendum as prescribed in the Act.[4] The Act goes further and specifically prohibits the label of identification from in any way "reflecting grade, classification or other matters regulated or governed by any other agency of the State or federal government". (Georgia Laws 1968, pp. 1118–1125, § 12.)

In practical application the effect of the *1960* Georgia statute was to prevent tobacco which was Type 14 under the federal classification from being sold as Type 14 tobacco in Georgia if it did not meet the Georgia statutory definition, with a resultant wide disparity in prices received by the grower for tobacco which was classified as Type 14 under the federal statute but did not meet the Georgia statutory definition of such type. The evidence in this case shows that the 1968 statute and the label attached as a result thereof has had no practical effect on the price received by out-of-state growers of tobacco on the Georgia markets. In fact, the evidence shows that tobacco brought into Georgia from out-of-state brings a price competitive with that which is grown in Georgia and sold on the Georgia market and that the tobacco from out-of-state which is sold on the Georgia market brings virtually the same price that the same tobacco brings on the market located at its place of production (R. 84–86).

Complainant contends that inasmuch as the label is physically attached to the warehouse ticket which is placed on the various piles of tobacco and upon which ticket is located the information of the federal classification, that the attachment of that label to the ticket has the effect of violating the federal standards. I do not find this contention to be valid. The information concerning these official standards as to "type" and "grade" are placed in the right hand corner of the warehouse ticket, which is a rectangular ticket on a cardboard base. In practical application the warehouse tickets come with the type printed thereon and the Government Grader only places the grade on each individual ticket after an inspection. No other information on that warehouse ticket is shown to have been prescribed by the Federal Government and apparently the only official information on that ticket is the "type" and "grade" as herein above referred to. In fact, the Tobacco Inspection Act itself (7 U.S.C.A. § 511g) specifically provides that, "Warehousemen shall provide *space* on warehouse tickets or other tags or labels used by them for showing the grade of the lot covered thereby as determined by an authorized tobacco inspector under this chapter". (Emphasis supplied.) It is readily seen therefore that the warehouse ticket is not a federal ticket and that the information contained thereon is in no way governed by any federal regulation and that any information thereon is not per se violative of any federal regulation.

The evidence in this case demonstrates that tobacco is a product of great economic importance in the State of Georgia. It was estimated that in spite of adverse weather conditions 111,000,000 pounds would be grown in the State in 1968 and in the year 1967 148,000,000 pounds were grown. Applying the price brought for the tobacco, it is seen to be a multi-million dollar industry in the State of Georgia from which its citizens derive great economic benefit.

4. A facsimile of the label is appended hereto.

The evidence further shows that in some instances buyers of tobacco at auction who purchase for processors, exporters and manufacturers have customers who specify that they buy certain grades of tobacco which they characterize as "Georgia" tobacco and that the labelling of tobacco definitely showing the area of production of that tobacco would have a favorable effect on its sale (R. 105–106).

It is thus clearly demonstrated that the State of Georgia and her citizens have a tremendous economic interest in the sale of tobacco and the promotion of that commodity grown in Georgia and that Georgia tobacco commands a unique place in the market with certain buyers because of its characteristics, which for various reasons are not indigenous to tobacco grown elsewhere, which characteristics cannot be determined by a visual examination of the tobacco. The State of Georgia, therefore, was acting within a legitimate exercise of its police power in attempting to protect and promote a product in which its citizens have a substantial interest.

The Supreme Court of the United States has said:

> "The protection of the state's reputation in foreign markets, with the consequent beneficial effect upon a great home industry, may have been within the legislative intent, and it certainly could not be said that this legislation has no reasonable relation to the accomplishment of that purpose."

Also:

> "Nor does it make any difference that such regulations incidentally affect interstate commerce, when the object of the regulation is not to that end, but is a legitimate attempt to protect the people of the state." Sligh v. Kirkwood, 237 U.S. 52, 59, 35 S.Ct. 501 L. Ed. 835 (1915).

 With full recognition of the fact that the majority of the Supreme Court in *Hussey* has stated that complementary regulations are as fatal as conflicting regulations, still it is my view that the Act under attack in no way attempts to vary, invade nor complement the field of typing or grading, as is done under federal regulation. This Act simply identifies the producer of the product and the place of production so that a buyer to whom such facts may be important may be informed of that fact when making the purchase. To hold that a State may not make provision for the promotion of the products which are important to its economy, so long as that promotion does not interfere with, nullify, vary or supplement the classifications imposed by the federal government, would be to completely ignore and abandon the universally known principle that one person prefers the product of one producer while another person prefers the product of another producer even though the product bears the same government type, grade and specification. To so hold would be to decree that any product with respect to which the government had sought to impose its classifications and standards must be sold by that identification alone. Such a holding would completely nullify the purpose of selling tobacco at auction. There is nothing in the statutory provisions or the regulations of the federal government which indicates a federal purpose that each producer should receive the same price for his tobacco of the same type and grade at the market. The overriding purpose of those statutes and regulations seems to me simply to make provision for a uniform classification so that each producer may have an equal opportunity to receive the best possible price for his product of a given type and grade. The Tobacco Inspection Act itself (7 U.S.C. § 511a.) provides that "without uniform standards of classification and inspection the *evaluation* of tobacco is susceptible to speculation, manipulation, and control, and *unreasonable* fluctuation in prices and quality determinations occur which are detrimental to producers and persons handling tobacco in commerce \* \* \*". (Emphasis supplied.) Thus the statute shows the prime purpose

of the Congress in authorizing regulation and classification was to have a uniform "evaluation" and it also shows that it was anticipated that there would be a differential in prices. The only thing sought to be guarded against was that there would not be an "unreasonable" fluctuation based on an improper "evaluation". The Georgia statute of 1968 in no way brings on the evils, or either of them, which were sought to be guarded against by Congress.

Having determined that the provisions of the Georgia statute under attack are a clearly lawful exercise of the police powers of the State of Georgia and are not violative of any prohibitions of the United States Constitution, judgment will be entered denying the relief sought by the complaint.

APPENDIX