Tom **LEWIS**, Complainant-Appellant,

v.

Phil **CAMPBELL**, Commissioner of Agriculture, State of Georgia, et al., Defendants-Appellees.

No. 27242.

United States Court of Appeals, Fifth Circuit.

April 14, 1970.

William J. Neville, Statesboro, Ga., for complainant-appellant.

Homer S. Durden, Swainsboro, Ga., Denmark Groover, Jr., Macon, Ga., A. Joe Nardone, Jr., Atlanta, Ga., for defendants-appellees.

Before RIVES, COLEMAN and GODBOLD, Circuit Judges.

RIVES, Circuit Judge:

Issues originally of broader scope [1] have been narrowed to the single question of whether the provisions of the 1968 Georgia Agricultural Sales Promotion Act,[2] requiring the labeling of tobacco grown in Georgia to show that it is Georgia tobacco grown by a contributing member of the Georgia Agricultural Commodity Commission,[3] invade a field pre-empted by the Federal Tobacco Inspection Act, 7 U.S.C. §§ 511–511q, as construed in Campbell v. Hussey, 1961, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299, aff'd Hussey v. Campbell, S.D.Ga.1960, 189 F.Supp. 54.

We think that this case is controlled by Campbell v. Hussey, *supra,* and therefore quote at length from the opinion of the Court: [4]

"We do not have here the question whether Georgia's law conflicts with the federal law. Rather we have the question of pre-emption. Under the federal law there can be but one 'official' standard—one that is 'uniform' and that eliminates all confusion [3] by

"3. The court below stated:

"'The Georgia statute defines Type 14 tobacco on the basis of geographical origin and upon no other basis. If it is grown in Georgia, it would be Type 14 under the Georgia law and be given a white tag; while if it came from the other side of the Savannah River in South Carolina it would not be Type 14 and would be given a blue tag. * *

" 'Both the purpose and effect of the Georgia enactment were to make a distinction at the markets, by the color tags, between tobacco grown in Georgia and that grown elsewhere. The effect was to create a wide disparity of price between the two groups of tobacco, the Carolina growers receiving a much lower amount. This resulted in losses of business to the plaintiff warehousemen.' 189 F.Supp. 54, 59.

classifying tobacco not by geographical origin but by its characteristics. In other words, our view is that Congress, in legislating concerning the types of tobacco sold at auction, preempted the field and left no room for any supplementary state regulation concerning those same types. As we have seen, the Federal Tobacco Inspection Act in § 2, 7 U.S.C. § 511a, says that 'uniform standards of classification and inspection' are 'imperative for the protection of producers and others engaged in commerce and the public interest therein.' The House Report No. 1102, 74th Cong., 1st Sess., reviewed at length the harm to growers that resulted from the absence of regulations governing the 'grades' of tobacco sold on the auction market. 'There are between 60 and 100 grades in a single type of tobacco, and it is not practical for a farmer to familiarize himself with the technical factors on which these grades are based * * *.' *Id.,* p. 2. The need for 'a definite standard' of grading, *id.,* p. 2, or of 'standard grades,' *id.,* p. 4, was repeated over and again. The importance of a 'standard grade' was emphasized in the debates on the floor of the House. Congressman Hancock stated that this legislation provided that tobacco on the auction market 'would be inspected by competent judges of tobacco in Government employ and graded according to

1. See opinion of the District Court, Lewis v. Campbell, M.D.Ga.1968, 292 F.Supp. 961.

2. Georgia Laws 1968, Vol. I, pp. 1118–1125.

3. See Lewis v. Campbell, *supra,* 292 F. Supp. at 968 for a facsimile reproduction of the label.

4. There was a strong dissent by Justice Black, joined by Justices Frankfurter and Harlan, but this Court is of course bound by the majority decision.

United States standards of quality * * *.' 79 Cong.Rec. 11870. Congressman Mitchell added that 'Standard grades would serve as a guide to farmers in classifying their tobacco for market.' *Id.*, 11878. The Senate Report No. 1211, 74th Cong., 1st Sess., based its approval of the bill on a report made by the Department of Agriculture. After stating that the purpose of the bill was to provide 'uniform standards' for the protection of farmers, the report added: 'The bill would authorize the Secretary of Agriculture to establish standards for tobacco by which its type, grade, size, condition, or other characteristics may be determined, and the standards so established would be the official standards of the United States for such purpose.' *Id.*, p. 1.

"The Act, as we have seen, adopts that view by making the 'type, grade, size, condition' given inspected tobacco 'the official standards of the United States.' § 3, 7 U.S.C. § 511b. The regulations are precise and unequivocal in saying what those 'official standards' are. Among other things they say, as already noted, that tobacco 'which has the same characteristics and corresponding qualities, colors, and lengths shall be treated as one type, regardless of any factors of historical or geographical nature which cannot be determined by an examination of the tobacco.' 7 CFR, 1961 Cum.Supp., § 29.1096. Tobacco is includable in type 14, regardless of where it may have been grown, provided it meets the specifications of that type.

"We have then a case where the federal law excludes local regulation, even though the latter does no more than supplement the former. Under the definition of types or grades of tobacco and the labeling which the Federal Government has adopted, complementary state regulation is as fatal as state regulations which conflict with the federal scheme. Missouri

Pacific R. Co. v. Porter, 273 U.S. 341, 346 [47 S.Ct. 383, 71 L.Ed. 672]; Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 [67 S.Ct. 1146, 91 L.Ed. 1447]; Hood & Sons v. Du Mond, 336 U.S. 525, 543 [69 S.Ct. 657, 93 L.Ed. 865]."

This case really turns on a very narrow point, that is, the extent of the preemptive design of the Federal Tobacco Inspection Act. In Florida Lime and Avocado Growers v. Paul, 1963, 373 U.S. 132, 147, 83 S.Ct. 1210, 10 L.Ed.2d 248, the Court contrasted that act with the Agricultural Adjustment Act and said:

"The provisions and objectives of the Agricultural Adjustment Act bear little resemblance to those in which only last Term we found a preemptive design in Campbell v. Hussey, 368 U.S. 297 [82 S.Ct. 327, 7 L.Ed.2d 299]. In the Federal Tobacco Inspection Act involved in that case, Congress had declared 'uniform standards of classification and inspection' to be 'imperative for the protection of producers and others engaged in commerce and the public interest therein.' 7 U.S.C. § 511a. The legislative history was replete with references to a need for 'uniform' or 'official' standards, which could harmonize the grading and inspection of tobacco at all markets throughout the country. Under the statute a single set of standards was to be promulgated by the Secretary of Agriculture, 'and the standards so established would be the official standards of the United States for such purpose.' S.Rep. No. 1211, 74th Cong., 1st Sess. 1."

The evidence was not at all clear as to how effective the present law had proved. At the time of trial it had operated for only 11 days of a 20-day selling season. Cause and effect could be ascribed to shortages in the tobacco crop, to differences in the grades of the various piles of tobacco, to inherent superiority of Georgia tobacco, to labeling

of tobacco grown in Georgia as Georgia tobacco, or possibly to other factors. The evidence was, however, without dispute that over a six-year period the relative sales price of Georgia tobacco on the Georgia market and Carolina tobacco on the Georgia market showed a consistent differential in favor of Georgia tobacco. Nor was there any dispute that the purpose of the present Georgia law was to promote sales of Georgia tobacco. The witness David Newton, an employee of the Georgia Commissioner of Agriculture, testified:

"Q. Well, what is the advantage of putting the Georgia stamp, the Georgia label on it; isn't it to get a better price for Georgia's product over South Carolina's product; isn't that the purpose?

"A. There are certain buying companies that have seemed to prefer over the years to use Georgia tobacco; but why they prefer it, I would not attempt to say.

"Q. So, if it is identified, those companies would give, are willing to pay a premium for Georgia tobacco?

"A. Yes sir, but that's not true with all companies but some companies do have a preference for Georgia tobacco.

"Q. So, that is the purpose?

"A. So, we would hope, not only to promote tobacco, but to promote other crops.

"Q. But in this particular, of course, it is tobacco and that would be the purpose in putting it on there?

"A. Yes sir.

"Q. Where those companies that prefer Georgia tobacco could more easily identify it and obtain Georgia prices for Georgia tobacco rather than South Carolina tobacco?

"A. Yes sir.

"Q. And they would give a premium for it?

"A. Yes sir, but we're not attempting to hurt anybody else's type of tobacco."

Whether effective or not, the purpose of the provisions of the Georgia statute now under attack is so nearly identical with that of the Georgia Tobacco Identification Act invalidated in Campbell v. Hussey that it might well be described in the same terms which the Supreme Court quoted from the opinion of the three judge district court: "Both the purpose and effect of the Georgia enactment were to make a distinction at the markets, by the * * * tags, between tobacco grown in Georgia and that grown elsewhere. The effect was to create a wide disparity of price between the two groups of tobacco, the Carolina growers receiving a much lower amount. This resulted in losses of business to the plaintiff warehousemen." 368 U.S. at 300–301, 82 S.Ct. at 329.

True, section 12 of the present Act provides that "Such label shall in no way reflect grade, classification or other matter regulated or governed by any other agency of the State or Federal government," while the Georgia law invalidated in Campbell v. Hussey, *supra*, accomplished the same purpose more forthrightly by its definition of Type 14 tobacco.[5] We think, however, that the difference between the two statutes as applied to tobacco is purely formal, and that their substance, purpose and probable effect are the same. The design of the Federal Tobacco Inspection Act as construed in Campbell v. Hussey, *supra*, appears so comprehensive as to displace a state law which requires the labeling of tobacco by geographical origin with the purpose of promoting sales of the tobacco.

---

5. Quoted in 368 U.S. at 298 and 304, 82 S.Ct. 327.

Indeed the final judgment of the three-judge district court which was affirmed by the Supreme Court in Campbell v. Hussey, *supra*, specifically enjoins such a practice.[6]

The judgment is therefore reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

COLEMAN, J. (dissenting).

COLEMAN, Circuit Judge (dissenting).

I respectfully dissent.

With deference, it is my view that Campbell v. Hussey, cited in the majority opinion, is not controlling. What that case held was that Georgia could not foster a tobacco classification based on geography rather than upon the characteristics of the product.

Here, however, we have nothing but the right or power of the State, separate and apart from classification, to identify a product grown within its borders—identification and nothing but identification.

I am not prepared to hold that this was (or is) preempted by the federal statute. Congress made no such declaration. Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835 (1915) was on the books when the Tobacco Inspection Act was passed. See, also, Pike v. Church, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1967).

I would affirm.

---

6. "Ordered, adjudged and decreed that the defendants and their successors in office and all others acting in behalf of them or either of them are hereby perpetually and permanently enjoined and restrained * * *; from enforcing or attempting to enforce, by direct or indirect or other means, on any tobacco market in Georgia, any method, plan or device which identifies or tends to identify tobacco offered for sale as to its geographic origin, or which, in any manner distinguishes or differentiates between tobacco having its origin in Georgia, Florida or Alabama on the one hand, or in South Carolina or North Carolina on the other hand; and from making or requiring any distinction or differentiation on the tobacco markets between separate lots of tobacco by reason of any geographic origin or place of growth."